William H. **GORDON** and Fern Gordon, his wife, Plaintiffs-Appellees-Cross Appellants,

v.

du**PONT GLOBE FORGAN INCORPO-RATED,** Defendant-Appellant-Cross Appellee.

No. 73–1382.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1973.

Rehearing Denied Jan. 10, 1974.

Earl D. Waldin, Jr., Paul M. Stokes, Miami, Fla., for defendant-appellant.

Richard B. Marx, Miami, Fla., for plaintiffs-appellees.

Before THORNBERRY, SIMPSON and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

The court below awarded the Gordons $20,000 for damages resulting from defendant brokerage firm's failure to notify them that their account was undermargined, a breach of its fiduciary duty. On appeal duPont contends that the Gordons' knowledge of their account's undermargined condition operates as ratification and a bar to this suit, and duPont is entitled to recover the deficiency remaining after it closed the Gordons' account. On cross appeal the Gordons find error in the trial court's dismissing their claim alleging a cause of action under the rules of the New York Stock Exchange. We reverse the judgment

against duPont and deny its counter-claim and appellees' cross appeal.

New York Stock Exchange Rule 431 [1] sets the minimum permissible margin maintenance level at twenty-five percent. That is, if one chooses to trade on margin, he must always have equity in his margin account equal to at least twenty-five percent of his stock's market value. Appellant set its own margin maintenance requirement at thirty percent, and its computer is programmed to give a warning when margin accounts fall below that level.

In this case, however, duPont did not utilize the computer because it had granted the Gordons a special dispensation by lowering their margin requirement to twenty-five percent. The task of overseeing the Gordons' margin status fell to Morton Frank, their broker. He inadvertently allowed their account to become undermargined on July 14, 1971, and they became aware of the undermargining a "reasonable period of time" afterwards.[2] Frank finally discovered his error on November 22, 1971, and immediately asked Mr. Gordon for more margin. Gordon declined to meet this margin call, and negotiations ensued. When Frank made one last margin call on November 29, Gordon demurred, saying he would like to wait until 3:30 p. m. that day before making a decision. Unable to wait any longer, Frank liquidated the Gordons' account. The sale fell $1550 short of satisfying the Gordons' debt to duPont, and duPont's counterclaim seeks to recover this deficit.

The trial court found that duPont breached its common law fiduciary duty to the Gordons when it failed to notify them promptly after their account became undermargined. The court awarded damages of $20,000, the account's equity value when it first became undermargined on July 14, 1971. In other words, if duPont had liquidated the Gordons' account on the day it first became undermargined, their debt to duPont would have been satisfied with $20,000 to spare.

■ In determining whether the Gordons are entitled to recover damages for duPont's breach of its fiduciary duty we must remember that they knew their account's true condition for several months while they waited silently for Frank to discover his mistake. The effect of such behavior on their right to recover is a state law question.

While no Florida case is directly in point, a Florida appellate court dealt with an analogous situation in Hayden, Stone, Inc. v. Brown, Fla.Ct.App.1969, 218 So.2d 230, cert. denied, 225 So.2d 539 (Sup.Ct.Fla.). In that case plaintiff charged that his stockbroker negligently recommended speculative, volatile stocks and failed to supervise his account properly. However, the evidence showed that plaintiff was aware of the nature of the stocks bought for him, and he approved each purchase. He received monthly statements showing the status of his account, and he never objected to the way his account was being handled. In light of that evidence the court adopted the view of the court in Carr v. Warner, D.Mass.1955, 137 F.Supp. 611.

> Even if there had been a breach of duty . . . plaintiff by repeatedly accepting confirmations and accounts, which fully disclosed all aspects of the transactions, elected not to rely upon

---

1. The rule provides, in pertinent part:
   (b) The margin which must be maintained in margin accounts of customers, whether members, allied members, member organizations or nonmembers, shall be
   (1) 25% of the market value of all securities "long" in the account; . . .

2. The Gordons' attorney stipulated before trial that Mr. Gordon became aware that his account was undermargined at "a reasonable period of time after July 14th" and before November. Mr. Gordon received monthly account statements and examined them with care. Therefore we interpret this unusual, enigmatic stipulation to mean that he learned of the undermargining no later than the receipt of his first monthly statement following July 14, and we assume he was informed by mid-August.

that breach. Moreover, by failing seasonably to make complaints of facts of which she was informed, she would in any event be barred from her later assertion of wrong done unto her by the partnership or corporation. 137 F.Supp. at 615.

■ As we read *Hayden, Stone*, under Florida law a customer who knows of his broker's breach of duty and takes no action will be barred from bringing suit. In the instant case Mr. Gordon knew "a reasonable period of time after July 14" that his account was undermargined and merely waited for his broker to discover the mistake. He did not rely upon the breach, and he did not seasonably complain. He knew of the breach of duty and he acquiesced. Such behavior must bar his recovery here.

In its counterclaim duPont seeks to recover the $1550 deficiency that remained after the Gordons' account was closed. When the Gordons opened their account, they authorized duPont to sell all their securities if they failed to meet a margin call, and they agreed to be liable for any deficiency that remained after the sale.

■ While it is true that the Gordons had a contractual obligation to make up the $1550 deficit, it is also true that the deficit was at least partially the result of duPont's failure to compute the margin status correctly and give prompt notice of the undermargining. We cannot allow duPont to recover indebtedness that resulted from its own breach of duty, and therefore we must reject its counterclaim. *See* Goldenberg v. Bache and Co., 5th Cir. 1959, 270 F.2d 675, 681.

Perhaps anticipating our negative ruling on their common law claim, the Gordons urge that we find an implied private right of action under N.Y.S.E. rules 431 and 432 [3] governing margin maintenance and brokers' record keeping. They acknowledge that no circuit court has found such a right of action under these particular rules, but they fashion a precedent for us by reading two circuit cases together.

The Seventh Circuit has said that other stock exchange rules will support a private right of action. Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, 7th Cir. 1969, 410 F.2d 135, cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (Rule 405, the know-your-customer rule). And the Second Circuit has held that a private cause of action exists under the initial-purchase margin requirements set out in Regulation T,[4] which implements section 7 of the Securities Exchange Act of 1934.[5] Pearlstein v. Scudder & German, 2d Cir. 1970, 429 F. 2d 1136, cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550. Thus the way is clear, we are told, to synthesize these two holdings and imply a right of action under the stock exchange rules setting margin maintenance standards.

Even if we created a right of action under stock exchange rules, the problem of the Gordons' prior knowledge remains. It is their apparent hope that such a new cause of action will treat them less harshly than did the common law. That theory is buttressed by *Pearlstein, supra*, in which the court said a stockholder could recover from his broker even though he knew the broker had failed to comply with Regulation T's initial-purchase margin requirements.

3. Rule 432 provides, in pertinent part:
   (a) Each member organization carrying securities margin accounts for customers shall make each day a record of every case in which, pursuant to the rules of the Exchange or regulations of the Board of Governors of the Federal Reserve System, initial or additional margin must be obtained in a customer's account because of the transactions effected in the account on that day.

The record shall be preserved for at least twelve months, and shall show, for each account, the amount of margin so required and the time when and manner in which the margin is furnished or obtained. The record shall be maintained in a manner satisfactory to the Exchange.

4. 12 C.F.R. § 220.

5. 15 U.S.C.A. § 78g.

With all due deference to the Second Circuit, we must disagree with an approach that so unilaterally favors the stock purchaser at the expense of his broker. The case before us illustrates the inequitable results that can flow from such an approach. The broker inadvertently miscalculated the Gordons' margin. The error did not cloak them in ignorance, however, because Gordon received periodic account statements from duPont and discovered the undermargining "a reasonable period of time" after it occurred. The broker's error instead allowed Gordon to avoid bothersome margin calls while his equity dwindled. He could gamble that his stock would appreciate in value without having to bolster his margin account with resources he could employ elsewhere. And when his stock fell so low that his margin account had a deficit instead of equity he had no incentive at all to put up more margin, for he could simply let the broker sell him out and let duPont take part of the loss. In fact that is what he did.

But, it can be argued, if we give stock purchasers a broad right of action unencumbered by an *in pari delicto* defense, we will help enforce the stock exchange rules by deterring the brokers who might desire to violate them. This brings to mind the words of Judge Friendly:

> Any deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who . . . . is placed in the enviable position of "heads-I-win tails-you-lose."

Pearlstein v. Scudder & German, 2d Cir. 1970, 429 F.2d 1136, 1148 (Friendly, J., dissenting).

Thus we hold that under Rules 431 and 432 there is no right of action that will allow a recovery to investors who know their accounts are inadvertently undermargined, maintain their silence for a substantial period of time, and take no corrective action. We do not hold that it would always be improper to impose civil liability under these two rules, nor do we say a right of action can never be implied under stock exchange rules generally. We simply express no opinion beyond the narrow holding of this case.

The judgment of the district court is reversed in part and affirmed in part. Each party will pay his own costs.