Arthur F. McCORMICK, Individually, and as Trustee of the A. F. & T. R. McCormick Trust, Plaintiffs-Appellants,

v.

James V. ESPOSITO et al., Defendants-Appellees.

No. 73–3118.

United States Court of Appeals, Fifth Circuit.

Sept. 13, 1974.

Arthur F. McCormick, Jr., Miami, Fla., for McCormick, Sr.

James W. Crabtree, Samuel C. Ullman, Miami, Fla., for defendants-appellees.

Before GEWIN, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

This dispute between a stock brokerage house and its stock-broken customer propels us into the esoteric Wall Street world of Margin Accounts and Special Miscellaneous Accounts. Plaintiff customer, who proved to be unjustifiably bullish in the arena of stock exchange securities, now seeks the judicial security of the federal courthouse and asks for damages for defendants' alleged violations of securities regulations and New York Stock Exchange Rules. We decline, however, to take a bearish view of defendants' margin accounting practices, and we therefore affirm the judgment

of the district court dismissing plaintiff's action.

## I. FACTS

Plaintiff Arthur F. McCormick and his wife, T. R. McCormick, opened a joint account with defendant Goodbody & Co. [Goodbody], a limited partnership,[1] in June of 1964, and maintained that account until T. R. McCormick died in November 1966. On January 13, 1967, plaintiff opened a general margin account[2] with Goodbody and continued to do business with defendant until February 1970. At that time, in accordance with the "Customer's Agreement" signed by McCormick (Record, Vol. V, p. 1793), Goodbody liquidated the securities held in the account in order to satisfy McCormick's then existing obligation to Goodbody. Goodbody alleged that, following the liquidation, $5729.76 of the obligation remained unfulfilled.[3]

1. James V. Esposito and the other named defendants were partners of Goodbody at the time the suit was filed.

2. In a margin account the customer is permitted to pay the broker less than the market value of the securities purchased; the customer then owes the broker the difference between the market value of the securities at the time of purchase and the amount paid the broker. The extension of credit by brokers is governed by Regulation T of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 220.1 et seq., promulgated pursuant to sections 7 and 8(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78g, 78h(a).

3. Goodbody filed an action for debt against McCormick in Florida state court in January, 1971, to recover the amount allegedly due. McCormick filed an answer and a counter-claim for damages for violations of initial margin requirements under the Securities Exchange Act of 1934. The state court dismissed the counter-claim for lack of subject matter jurisdiction.

4. The district court also determined that "the claim of the A. F. & T. R. McCormick Trust is that of an ordinary trust and as such may not be asserted under the Securities Exchange Act of 1934, as amended." (Conclusions of Law ¶ 2, Record, Vol. VI, pp. 2094–95). That conclusion was apparently based on the court's finding that the

McCormick commenced the present suit in July 1971, individually and as trustee of the "A. F. & T. R. McCormick Trust," seeking damages for nine allegedly illegal extensions of credit not permitted by Regulation T, 12 C.F.R. § 220.1 et seq., and for violations of New York Stock Exchange Rules 431 and 432 relating to maintenance margin requirements. The alleged Regulation T infractions, which occurred between July 10, 1968 and January 24, 1969, involved seven trades initiated by McCormick and two payments to McCormick by check drawn on Goodbody. The alleged Rule 431 and 432 violations involved the status of McCormick's account from November 18, 1969 to November 28, 1969. The case was considered below on extensive pretrial stipulations and a stipulated record; both the Regulation T and the Rule 431 and 432 issues were decided adversely to plaintiff,[4] and plaintiff appeals.

trust was an "ordinary, simple trust." as opposed to a "business trust" and thus was not entitled to assert a claim as a "person," which the Act defines as "an individual, a corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization." 15 U.S.C. § 78c(a)(9). We need not review that determination here, since all claims that McCormick raised in his capacity as trustee he also raised in his individual capacity. Even assuming that the trust could assert a claim under the Act, its cause of action would fail for the same reasons that McCormick's individual claims must fail.

Neither do we reach the thorny problems surrounding Goodbody's belated assertion of a statute of limitations defense. Under paragraph 8(b) of their Pretrial Stipulation (Record, Vol. IV, p. 1502), the parties agreed that at least eight of the nine transactions challenged under Regulation T were *not* barred by *any* statute of limitations. In its subsequent trial brief Goodbody requested leave to amend paragraph 8(b) of the Pretrial Stipulation to provide that all nine transactions were "barred by statute of limitations contained in Florida Statutes § 517.-21" (Record, Vol. V, p. 1648); McCormick neither agreed nor explicitly objected to that request. The district court granted leave to add the affirmative defense and then held that McCormick's claims with respect to all

## II. REGULATION T AND THE S.M.
## A. DEFENSE

McCormick brought his Regulation T action under section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, which vests exclusive jurisdiction of violations of the Act and "rules and regulations thereunder" in the federal courts. The district court apparently assumed that Goodbody was subject to civil liability to its customer for violation of initial margin requirements, and Goodbody does not question that assumption. In Pearlstein v. Scudder & German, 2 Cir. 1970, 429 F.2d 1136, cert. denied, 1971, 401 U.S. 1013, 91 S. Ct. 1250, 28 L.Ed.2d 550, the Second Circuit held that the customer had a right of action against the brokerage house under section 27 for its violation of section 7 margin requirements, 15 U. S.C. & 78g.[5] The Court reasoned that,

[a]lthough the congressional committee report which recommended the enactment of Section 7 indicates that the protection of individual investors was a purpose only incidental to the protection of the overall economy from excessive speculation, it has been recognized in numerous cases since that time that private actions by market investors are a highly effective means of protecting the economy as a whole from margin violations by brokers and dealers.

429 F.2d at 1140. We agree with the Second Circuit's analysis as it relates to regulations promulgated under section 7,[6] and conclude that the court below correctly decided to determine the claim on its merits.

The parties brought the Regulation T issue into sharp focus before the district court. In paragraph 9(f) of their Pretrial Stipulation the parties provided that the court must determine "[w]hether excessive credit was extended to Plaintiffs by GOODBODY & CO., a limited partnership, in violation of Regulation T." They then gave the following explanation:

The parties agree that in order to resolve this issue of law, the Court must necessarily determine the legality of the account maintained by [Goodbody], which was labeled by [Goodbody] as a Special Miscellaneous Account. Specifically, the Court must determine whether said Special Miscellaneous Account was authorized by Regulation T and whether it was maintained by [Goodbody] pursuant to Regulation T. If the Court should determine that [Goodbody] was permitted by Regulation T to maintain a Special Miscellaneous Account, that the account labeled by [Goodbody] as a Special Miscellaneous Account was the type of account authorized by Regulation T, Section 4(f)(6), that the entries which were made in the S. M.A. ledgers which [Goodbody] maintained were made in a manner authorized by Regulation T, and that the effect of the accounting procedures so employed was to eliminate what would otherwise be an excessive extension of credit, then the Defendants did not vi-

nine transactions were barred by the section 517.21 statute of limitations. Because we affirm the district court's decision upholding Goodbody's Regulation T defense on the merits, we need not decide whether the court properly permitted the unilateral amendment of the Pretrial Stipulation, and if such amendment was proper, whether the court applied the appropriate statute of limitations.

5. In *Pearlstein* the customer sought to recover from the broker the difference between the amounts he would have received for securities not paid for on time if the

broker had sold those securities on the day payment was due and the amounts actually received when the securities were sold later. Although McCormick does not explicitly state in his brief or complaint the nature of his damages, his theory is presumably similar to Pearlstein's.

6. In Gordon v. duPont Glore Forgan, Inc., 5 Cir. 1973, 487 F.2d 1260, cert. denied, 1974, 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666, we declined to extend the *Pearlstein* analysis to New York Stock Exchange rules. *See* Part III, *infra*.

olate Regulation T. However, if the Court should find that Regulation T, Section 4(f)(6) does not authorize the maintenance of a Special Miscellaneous Account which [Goodbody] maintained or that said Special Miscellaneous Account was not maintained for Plaintiffs by [Goodbody] in a manner consistent with Regulation T, then there would have been excessive extensions of credit. (Pretrial Stipulation ¶ 9(f), Vol. IV, pp. 1504–05).

The "Special Miscellaneous Account" (S.M.A.) is an accounting procedure first adopted by members of the New York Stock Exchange in 1942. Prior to the advent of the S.M.A. the practice among brokerage firms was to permit the customer to deposit the proceeds of a sale in a cash account; the customer could then use the cash to purchase additional securities in his margin account, or he could withdraw the cash at any time. The S.M.A. procedure consists of bookkeeping notations which enable a customer to preserve his right to use the proceeds of a sale without necessitating the opening or maintaining of a separate cash account. This type of account is maintained for the customer in conjunction with his general margin account,[7] and the customer—including McCormick in the present case—is so notified on each monthly statement sent to him by the broker.[8] The available credit balance in the S.M.A. in a "restricted" margin account [9] (such as McCormick's) consists of: (1) that part of the difference between the sale price and the 70% "retention requirement" that the customer has not withdrawn in cash; (2) any cash deposited by the customer; (3) dividends on securities held by the broker for the customer's account; and (4) certain appreciations in market value of the securities held in the account. In other words, the S.M.A.

---

7. The operation of the S.M.A. has been described elsewhere in some depth. See, e. g., W. Rubin & A. Gambaro, Fundamentals of Margin Trading 46–67 (1969). We here provide only a brief note on initial margin requirements and retention requirements in order to illustrate the relationship between an S.M.A. and a general margin account.

The parties stipulated that, at the times of all relevant transactions between them, the applicable initial margin requirement in effect under Regulation T was 80%—i. e., the customer was required to deposit 80% of the value of the securities to be purchased with the broker within five business days of the purchase. The broker was thus permitted to extend credit to the customer in an amount up to 20% of the value of the purchased securities.

Regulation T also limits the amount of cash a customer may withdraw from his account when "the adjusted debit balance of the account . . . would exceed the maximum loan value of the securities in such account after such withdrawal." 12 C.F.R. § 220.3(b)(2). Because the debit balance in McCormick's account exceeded the 20% maximum loan value (see Supplement to Pretrial Stipulation ¶ 8, Record, Vol. IV, p. 1562) of the securities in his account at the time of each of the transactions in question here, McCormick's account was "restricted" by the provisions of 12 C.F.R. § 220.3(b)(2). Section 3(b)(2)(iv) of Regulation T, 12 C.F.R. § 220.3(b)(2)(iv), provides that, in a restricted account, "upon the sale . . . of margin securities or securities having loan value in the general account, . . . there may be withdrawn in cash an amount equal to the difference between the current market value of the securities sold and the 'retention requirement' of such securities." The parties stipulated that the applicable "retention requirement" under Regulation T, Supplement, was 70%. Thus, the customer could withdraw in cash 30% of the market value of the securities sold. If the customer had an S.M.A., however, the entire proceeds from the sale of securities could be applied to the customer's debt to the broker, and the customer would retain in his S.M.A. the buying power of the 30% cash he could have withdrawn but did not.

8. The statements contained the following language:

If this is a "general" account it is a combined statement of your general account and of a special miscellaneous account maintained for you under Section 4(f)(6) of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of the separate account as required by Regulation T is available for your inspection upon request.

The district court found that McCormick had notice of the Special Miscellaneous Account maintained for him by Goodbody. (Findings of Fact ¶ 6, Record, Vol. VI, p. 2093).

9. See footnote 7, supra.

reflects those sums which the customer could have withdrawn following transactions and changes in his general margin account, but did not.[10]

The substance of plaintiff's S.M.A. complaint is that credit in an S.M.A. cannot properly be employed as "buying power" to legitimize extensions of credit that would otherwise be in violation of Regulation T. Plaintiff also contends that even if use of an S.M.A. may sometimes be valid, Goodbody has failed to establish the authenticity of its records of McCormick's account.

We find no merit in McCormick's secondary contention. The district court found that the recitation of the nine disputed transactions in the Pretrial Stipulation and in the Summary of Plaintiff's Account attached to the Pretrial Stipulation—both of which incorporated Goodbody's S.M.A. notations —"accurately set forth the nine transactions in question." (Findings of Fact ¶

10. This principle and the operations described in footnote 7, *supra*, can be illustrated with an example from plaintiff's account with Goodbody. On October 21, 1968, McCormick purchased 100 shares of Ford Motor Company stock at a total cost of $6019.98, and sold 100 shares of National Airlines stock yielding a net return of $3707.17. Assuming no S.M.A., McCormick would have been required to deposit with Goodbody within five business days of the October 21 transactions 80% of the difference between the cost of the Ford stock and the yield from the National Airlines stock. [80%($6019.98—$3707.17)=80%($2312.-81)=$1850.24].

Prior to the transactions effected on October 21, 1968, McCormick's account was as follows:

| Market Value | Equity | Debit |
|---|---|---|
| $343,052.50 | $179,634.84 | $163,417.66 |

Following the transactions of October 21, 1968, if Goodbody had demanded that McCormick meet the Regulation T initial margin requirement, McCormick's account would have been as follows:

| Market Value | Equity | Debit |
|---|---|---|
| $345,365.31 | $181,485.08 | $163,880.23 |

McCormick's account, however, did not stand as described. The parties' Pretrial Stipulation shows that, following the October 21 transactions, McCormick's account, without respect to the S.M.A., was as follows (Pretrial Stipulation ¶ 5(g). Record, Vol. IV, p. 1494):

| Market Value | Equity | Debit |
|---|---|---|
| $345,365.31 | $179,634.84 | $165,730.47 |

As indicated in text above, the parties agree that the extension of credit represented by the foregoing figures would constitute a violation of Regulation T, if the S.M.A. is not considered.

Goodbody did maintain an S.M.A. for McCormick, however, and it applied the alleged purchasing power in that account to meet the 80% margin requirement. Goodbody's books reflected the status of McCormick's account before and after the October 21, 1968 transactions as follows (Pretrial Stipulation ¶ 5(p). Record, Vol. IV, p. 1498):

| | Market Value | Equity | Debit | S.M.A. |
|---|---|---|---|---|
| Before | $343,052.50 | $179,634.84 | $163,417.66 | $2,269.77 |
| After | $345,365.31 | $179,634.84 | $165,730.47 | $ 419.53 |

As these figures demonstrate, because McCormick supplied no additional cash to complete the October 21 transactions, his equity remained the same. His debt to Goodbody was increased by the full amount of the difference between the cost of the shares purchased and the yield from the shares sold ($2312.81); and the purchasing power in his S.M.A. was diminished by 80% of that difference—i. e., by the amount of the margin requirement ($1850.24).

9, Record, Vol. VI, pp. 2093–94). Goodbody kept its S.M.A. records in the regular course of business; the evidence indicates that the records of McCormick's account were maintained in the usual manner; all computations appear to be mathematically sound. McCormick stresses that Goodbody has the burden of proving the authenticity of its S.M.A. notations. In the complete absence of any indication to the contrary, we are satisfied that Goodbody met that burden. The district court's finding is not clearly erroneous.

■ McCormick's primary argument, that an S.M.A. cannot be used as purchasing power to meet Regulation T initial margin requirements, has been addressed in some depth by Judge Pollack for the United States District Court for the Southern District of New York. Manevich v. duPont, S.D.N.Y., 338 F. Supp. 1124, aff'd mem., 2 Cir. 1972, 465 F.2d 1398. We agree with Judge Pollack that the use of S.M.A. notations to meet initial margin requirements is consistent with Regulation T. Section 4(f)(6) of Regulation T, 12 C.F.R. § 220.4(f)(6), provides:

§ 220.4 Special accounts.

· · · · · ·

(f) Special miscellaneous account. In a special miscellaneous account, *a creditor may*:

(6) Effect for any customer the collection or exchange (other than by sale or purchase) of securities deposited by the customer specifically for such purposes, and (subject to any other applicable provisions of law) received from or for any customer, and *pay out or deliver to or for any customer, any money or securities.* (emphasis added).

Judge Pollack reasoned that,

[i]f a broker can "pay out" to a customer "any money" the customer has in his SMA, then the broker can "pay out" that value to any other account of the customer, including a margin account, instead of simply handing over the cash.

338 F.Supp. at 1128. Thus, "[t]here can be no question that credit for dividends and cash advanced by the customer represents valid buying power." *Id.* This conclusion is obvious so long as it is remembered that the S.M.A. consists only of credit for sums which the customer could have withdrawn, but did not withdraw.

■ We are not persuaded by McCormick's argument that there is no proof that the margin securities in his account had a loan value, and thus no basis to conclude that he could have withdrawn cash from his account upon the sale of such securities. McCormick stipulated that the loan value of the securities in his account was 20% of the current market value of those securities. (Supplement to Pretrial Stipulation ¶ 8, Record, Vol. IV, p. 1562; *see* footnote 7, *supra*). McCormick's insistence that defendants must prove that the sales which yielded S.M.A. notations involved securities held in his account since March 11, 1968, in order to show compliance with Regulation T is without foundation. The March 11, 1968, requirement applies to registered "nonequity securities" and to "exempted securities," 12 C.F.R. §§ 220.3(b)(2)(i), 220.3(b)(2)(v), 220.3(c)(2), 220.8(a); the securities in McCormick's account were margin "equity securities." 15 U.S.C. § 78c(10)–(12). Regulation T expressly distinguishes between a margin equity security and a nonequity or exempted security, and provides that a margin equity security in a general account does have a loan value. 12 C.F.R. §§ 220.3(c)(2), 220.8(a)(1).

The Special Miscellaneous Account involves complex, and at times perplexing, accounting procedures. We are satisfied, however, that at least as it was used in the present case, the S.M.A. did

not involve any sleight of hand for escaping the initial margin requirements of Regulation T. McCormick's misfortune lay not with the form of his margin account but with its contents—he was the victim, not of grisly market practices, but of a grizzly market. Absent any wrongdoing on the part of the broker we are unable to provide any judicial remedy.

## III. NEW YORK STOCK EXCHANGE RULES 431 AND 432

McCormick contends that, over a substantial period of time, Goodbody violated Rules 431 and 432 of the New York Stock Exchange by the manner in which it maintained McCormick's account. Specifically, McCormick cites violations of Rule 431(b), which provides, in pertinent part:

> Maintenance margin rule. (b) The margin which must be maintained in margin accounts of customers . . . shall be as follows:
>
> (1) 25% of the market value of all securities "long" in the account.
> . . .

In their Amendment to Pretrial Stipulation the parties included a series of documents which they agreed accurately reflect the status of McCormick's account for the period November 18, 1969, to November 28, 1969, as to the market value of the securities in the account and the equity and debit existing in the account for each business day. Those records clearly show that the margin in McCormick's account was below 25% for each day during the November 18–28 period.[11] The issue presented to us on

this appeal is whether, having established a violation of New York Stock Exchange Rule 431(b), McCormick as a customer of Goodbody has a private cause of action against Goodbody under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

The district court concluded that "the violation of Rules 431 and 432 of the New York Stock Exchange does not create a cause of action cognizable in a federal court." (Conclusions of Law ¶ 4, Record, Vol. VI, p. 2095). Although we are not now prepared to endorse such a universal proposition, we affirm the district court's denial of relief on the facts of this case. In this respect our decision is substantially controlled by the recent opinion in Gordon v. duPont Glore Forgan, Inc., 5 Cir. 1973, 487 F.2d 1260, 1263, cert. denied, 1974, 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666, in which we held "that under Rules 431 and 432 there is no right of action that will allow a recovery to investors who know their accounts are inadvertently undermargined, maintain their silence for a substantial period of time, and take no corrective action."

McCormick's account was undermargined for a period of some eleven days, not because of new transactions completed for him by Goodbody, but because of daily declines in the market value of the securities in his account. Goodbody's failure to discover the undermargining of McCormick's account or to require that McCormick provide additional margin might be considered less excusable than the oversight involved in the Gordon case.[12] Nevertheless, the record contains

11. McCormick asserts in his brief that Goodbody admitted through pretrial stipulations that it was in violation of Rule 431(b) for a continuous seven month period. Our examination of the pretrial stipulations and other relevant portions of the record reveals no such admission and no such violation. In fact, for the seven month period apparently referred to, the margin maintained in McCormick's account was near or above 50%.

12. In Gordon the brokerage firm set its own maintenance margin requirement at 30%, but granted the Gordons a special dispensation by lowering their requirement to 25%. The firm's computer, which was programmed to give a warning when accounts fell below 30%, was not used for the Gordons' account, and the broker "inadvertently miscalculated the Gordons' margin." 487 F.2d at 1263.

no evidence that Goodbody intentionally ignored New York Stock Exchange rules or sought to mislead McCormick in any way. As we have noted, McCormick received a monthly statement of his account and was aware of the varying equity-debit status of his account. He certainly had reason to know when his account was undermargined, for as the district court found, "Mr. McCormick is a lawyer, has been in and out of the securities market place since 1929, personally maintained full control over his account, and was at all times completely informed as to the securities position of his account." (Findings of Fact ¶ 7, Record, Vol. VI, p. 2093). McCormick did not complain of Goodbody's maintenance margin practices or take any corrective action before Goodbody liquidated his account in February, 1970; and he continued his silence until Goodbody brought its state court action against him in January, 1971.

Judge Thornberry, writing for the Court in *Gordon*, explained the inequity of permitting the customer to recover under such circumstances:

> The broker's error . . . allowed Gordon to avoid bothersome margin calls while his equity dwindled. He could gamble that his stock would appreciate in value without having to bolster his margin account with resources he could employ elsewhere. And when his stock fell so low that his margin account had a deficit instead of equity he had no incentive at all to put up more margin, for he could simply let the broker sell him out and let duPont take part of the loss.

487 F.2d at 1263. McCormick seemed perfectly content to let Goodbody assume part of his loss until Goodbody took legal steps to have the debt satisfied. In the absence of any evidence of a broker's intentional violation of Exchange rules misleading of its customer, and in the presence of a customer who knew or should have known that his account was undermargined but took no corrective steps for so long as he stood to benefit from such undermargining, we decline to depart from the rule in *Gordon*.

In denying customer relief in this case we do not deprive good faith investors of protection from unscrupulous or overbearing brokerage practices. On the record before us we simply have not detected any such practices. The Special Miscellaneous Account when properly used is not a treacherous tool for evading Regulation T margin requirements; rather it is a proper means of preserving earned purchasing power within the spirit as well as the letter of Regulation T. Finally, while we do not foreclose the use of New York Stock Exchange Rules 431 and 432 as a protective cloak for investors if circumstances warrant, we will not permit their use here by a knowing beneficiary as a dagger against his perhaps too lenient broker.

Affirmed.