**HORNBLOWER & WEEKS-HEMPHILL, NOYES, a corporation**

v.

**D & G SUPPLY & MAINTENANCE CO., INC., a corporation, et al.**

**No. CA 3-6669-C.**

United States District Court,
N. D. Texas,
Dallas Division.
March 5, 1975.

C. Taylor Ashworth, Jenkens & Gilchrist, and David Ford Hunt, Dallas, Tex., for plaintiff.

Michael Jay Rune and Ron S. Galloway, Dallas, Tex., for D & G and McMillian.

Sam W. Lane, Jr., Dallas, Tex., for Carrington.

A. Howard Katz, Kansas City, Mo., for Silbiger.

## OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This dispute between a stock brokerage house and its customer presents the Court with two issues concerning stock margin accounts. First, the Court must determine whether the defendant-customers are liable to the plaintiff-broker for a deficiency resulting from the plaintiff's sale of securities held in a margin account for the defendants after the defendants failed to meet a margincall. Secondly, the Court must decide whether the plaintiff failed to mitigate its damage because of an alleged negligent delay in liquidating the undermargined account. Both issues must be decided for the plaintiff.

The Court's jurisdiction is founded upon diversity of citizenship, 28 U.S.C. § 1332. The plaintiff is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in New York. Defendant D & G Supply & Maintenance Co., Inc. (hereinafter referred to as D & G), is a corporation incorporated under the laws of the State of Texas and having its principal place of business in Texas; Defendant Richard A. Carrington (hereinafter referred to as Carrington) is an individual who is a citizen of the State of Texas; Defendant E. E. McMillian,

Jr., (hereinafter referred to as Mc-Millian) is an individual who is a citizen of the State of Texas; and Defendant Jack Silbiger (hereinafter referred to as Silbiger) is an individual who is a citizen of the State of Florida. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000. Venue is based upon 28 U.S.C. § 1391(a).

Upon the plaintiff's motion for severance, the plaintiff's claims against Defendant Silbiger were severed and continued as a separate and distinct action.

At the request of Defendant Carrington, plaintiff opened a new account for Defendant D & G, and purchased 4,000 shares of Magic Marker stock. Carrington was an employee of Defendant D & G. The account number was 39–24022–005 and the account was opened August 21, 1972. The new account form bears Social Security Number 465–24–4886 and that is the number of the Defendant McMillian. The number came from the person opening the account. Pursuant to the order, plaintiff purchased 4,000 shares of Magic Marker stock for the customer on August 21, 1972, for a total of $77,190.75, the stock being purchased at a price varying between 18⅞ to 17½. Thereafter, no funds being received from its customer, the plaintiff, on August 28, 1972, requested and secured an extension of time for the customer which extended the due date of payment until September 5, 1972. Plaintiff then communicated with the defendants the amount of margin call which, pursuant to the Federal Reserve Board, was $42,450.91 and this information had to be communicated by the Washington office of plaintiff to the defendants in order for the defendants to know what the margin call was. On September 7, 1972, plaintiff's Washington office was advised that D & G's check in the amount of $42,500.00 had been received by plaintiff's Dallas office and forwarded. The check was deposited by the Washington office on September 8 and credited to the account as payment of the margin call. The D & G check, deposited on September 8, 1972, was thereafter returned by the bank marked "insufficient funds" on September 14, 1972. Thereafter, the D & G check was again deposited on September 15, 1972, and again returned by the bank for insufficient funds on September 22, 1972.

Following the final rejection by the bank of the D & G check, plaintiff sent a sell-out wire to D & G requesting payment of the margin call by September 25, 1972, or the stock being held by plaintiff for the customer would be sold. No payment was received by plaintiff on September 25, 1972, and the 4,000 shares of Magic Marker stock were sold resulting in a deficiency to plaintiff.

Plaintiff then sent a demand letter dated September 29, 1972, to D & G calling for payment. Thereafter, on October 2, 1972, a $1,000.00 cash payment was received by plaintiff's Dallas office from "Gene McMillian (D & G Supply)".

No further monies have been received from defendants and there is presently due and owing to plaintiff by defendants the sum of $30,106.22 for which sum plaintiff sues herein.

It is uncontroverted in the record that the stock was purchased by the plaintiff for the customer, D & G, and that D & G has failed to make payment in restitution to plaintiff for the deficiency following the sell-out of the stock necessitated by defendants' failure to pay the margin call.

█ D & G is a Texas corporation and McMillian is the sole stockholder in D & G, as well as being its President and Director. At trial, McMillian contended that the margin account was opened on behalf of only co-defendant Carrington and that Carrington had no authority to make the purchase on behalf of either D & G or McMillian. That contention has no merit. While McMillian admitted that he signed the D & G check negotiated to the plaintiff and that the check bears the mark of D

& G's check protector, he denied that the check was filled out in either the name of the payee or the amount at the time he signed the check. That explanation is difficult to believe considering McMillian's admission that he knew that the check was being issued to pay for stock and that at the time he signed the check he knew the account did not have but about $3,000.00 in it at most. This was only one facet of McMillian's trial testimony, which was also incredible on other accounts.

These other accounts included McMillian's admissions that:

(1) he owned as much as 6,000 shares of Magic Marker stock in 1972 and was interested in Magic Marker stock and that he had failed to meet the margin call for one of his brokers, Brown-Allen, and was indebted by judgment to Brown-Allen for some $1,200.00 following a suit and a judgment entered against him.

(2) in 1971, Institutional Equity Corporation, a Dallas brokerage house, had purchased stock for D & G and that D & G had given Institutional Equity a check for $7,500.00 which bounced and, thereafter, Institutional Equity Corporation had sued D & G, McMillian and Carrington, received a judgment, which judgment was approved by their attorneys, and that McMillian had paid off the judgment, being some $1,769.55 plus $350.00 attorney's fees; that at the time McMillian signed the $7,500.00 check for Institutional Equity, there were not sufficient funds in the First National Bank in Mesquite to cover the check. Previously McMillian had denied in his deposition, and denied during the trial of this case, and continued to deny until being confronted with the file in the Institutional Equity suit, that he, McMillian, or D & G had ever had any other controversies with any stock brokerage houses other than the Brown-Allen suit.

(3) The Social Security number on Institutional Equity's new account form is number 465–24–4886, which is the same Social Security number as appears on plaintiff's new account form and the number is that of McMillian.

(4) He, McMillian, must have known that at the time he made the $1,000.00 payment to plaintiff's Dallas office on October 2, 1972, that the account had been opened and the stock purchased for Gene McMillian (D & G Supply) since the receipt he received from plaintiff's Dallas office was made out in those names and not in the name of Carrington.

(5) D & G's corporate bank accounts were in the Lakewood Bank, First Securities Bank, and First National Bank in Mesquite and plaintiff's new customer form reflects that the new customer, D & G, had a bank account in the Lakewood Bank.

(6) McMillian bought stock through the name of D & G, although he considered that the stock was being bought personally.

(7) Plaintiff's sell-out wire "may have been seen" by McMillian and plaintiff's demand letter "might have been seen" by McMillian.

The instant case is too close in its basic facts to previous activities of these defendants to be mere coincidence. It is readily apparent that previously the defendants have both played and lost at the securities margin account game.

■ D & G is liable to the plaintiff in that the account was (1) opened in D & G's name; (2) the stock was purchased for D & G; (3) D & G's check was received by plaintiff to meet the margin call; (4) the check was signed by the sole stockholder and President of D & G; and (5) after the sell-out of the stock by the plaintiff, D & G, by and through its President, delivered $1,000.-00 to plaintiff's Dallas office for application to the balance due in the account.

■ McMillian is liable to the plaintiff in that he (1) admitted that his

personal stock purchases were made through the name of D & G; (2) he is the sole stockholder as well as President of D & G; (3) by his further admission that he was personally giving Carrington monies with which to purchase the stock; (4) and that his "loan" to Carrington was in the form of a D & G corporate check for which he, McMillian, considered himself personally liable. Further, (5) McMillian knew at the time he signed the check that it was to be used by Carrington to pay for stock; (6) McMillian knew at the time he signed the check that there were insufficient funds in the account to cover the check. Furthermore, (7) that McMillian's personal Social Security number 465–24–4886, is the Social Security number turned in to plaintiff on its new customer account form and is, coincidentally, also the Social Security number used on the new customer form in the Institutional Equity Corporation suit. (8) McMillian further admits that he "may" have received the sell-out wire from plaintiff and the demand letter from plaintiff, although it is also undisputed in the record that plaintiff's records do not reflect at any time (9) any denial from McMillian and/or D & G of liability on the account and (10) McMillian paid $1,000.00 on the account to plaintiff's Dallas office.

■ Carrington is liable to the plaintiff by virtue of the testimony of McMillian that the Magic Marker stock being purchased through plaintiff was being purchased at the instance of Carrington for which Carrington intended to reimburse D & G and McMillian; that Carrington was an agent of D & G and a long-time associate of McMillian and that McMillian, on previous occasions, "loaned" monies to Carrington, presumably for purposes of either purchasing stock or defrauding stock brokerage houses.

■ It should further be pointed out, again, that defendants, and each of them, ratified the purchase of the stock and the resulting damages to the plaintiff by their joint payment to the plaintiff of $1,000.00 in cash to be applied to the account, which payment came on October 2, 1972, *after* the stock had been liquidated out with a resulting loss to plaintiff. The $1,000.00 was, pursuant to the receipt, received from D & G as well as McMillian and by virtue of McMillian's testimony, was also received indirectly from Carrington.

It should be further noted that as to the *amount of the margin call*, that that amount could *not* have been known to the customer except for oral communication between the plaintiff and the customer, and if the account was not authorized and the stock purchase was not authorized, then there is in the record no explanation from the defendants, or any of them, following the prima facie case of the plaintiff, as to how the defendants, or any of them, knew the amount of the margin call.

■ Defendants attempt to *"mitigate damages"* by claiming that plaintiff should have sold out the account either on September 5, 1972 (the date that the period of extension expired) or on September 14, 1972 (the date that D & G's check first bounced). This argument is without merit in that the record clearly reflects that the customary practice in the industry is to give the customer every benefit of the doubt and to accept the customer's check in good faith. In reference to the September 5 date, the record reflects that D & G's check is dated September 6 and was received in the Dallas office of the plaintiff on September 7 and thereafter until September 20 the check was being deposited and was being bounced by the bank. Then on September 22, plaintiff made the final demand to the customer calling for the margin payment on or before September 25, 1972. When the margin payment was not received by the plaintiff, the stock was promptly sold by plaintiff on

that date. The resulting loss to plaintiff cannot be mitigated by defendants, especially in view of their fraudulent presentation to plaintiff of a check for $42,500.00 which was not good at the time it was executed and delivered to plaintiff nor at any time thereafter. In the absence of any evidence of the plaintiff-broker's bad faith in liquidating the securities held in the defendants' account to satisfy the defendants' obligation to plaintiff, and in the presence of the defendant-customer who knew that its account was undermargined but took no corrective steps for so long as it stood to benefit from such undermargining, no right of mitigation exists in favor of said defendant. Gordon v. duPont Glore Forgan, Inc., 487 F.2d 1260 (5th Cir. 1974) cert. denied 1974, 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666; McCormick v. Esposito et al., 500 F.2d 620 (5th Cir. 1974). Judge Thornberry, writing for the Court in *Gordon* stated:

> The broker's error . . . allowed Gordon to avoid bothersome margin calls while his equity dwindled. He could gamble that his stock would appreciate in value without having to bolster his margin account with resources he could employ elsewhere. And when his stock fell so low that his margin account had a deficit instead of equity he had no incentive at all to put up more margin, for he could simply let the broker sell him out and let duPont take part of the loss. 487 F.2d at 1263.

We are faced with a very similar situation here and to allow the defendants' claim of mitigation would be most inequitable.

Additionally, to give effect to defendants' defenses in this case would be to permit defendants to gamble in the stock market with someone else's money. Judgment will be rendered against Defendants D & G Supply & Maintenance Company, Inc., Richard A. Carrington and E. E. McMillian, Jr., jointly and severally, for the sum of $30,106.22 plus interest from date and costs.