**SHEARSON HAYDEN STONE, INC., and Hayden Stone, Inc., Plaintiffs-Appellees,**

v.

**William H. LEACH, Defendant-Appellant.**

No. 77–2072.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1978.

Decided Aug. 31, 1978.

Irving I. Saul, Dayton, Ohio, for defendant-appellant.

Roger J. Makley, Dayton, Ohio, for plaintiffs-appellees.

Before SWYGERT, CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

The defendant, William Leach, appeals from a judgment entered upon a jury verdict for the plaintiff, Shearson Hayden Stone, Inc. (SHS) in the amount of $473,-563.32 plus interest. The basis of this action was Leach's breach of a customer agreement entered into with SHS, as broker, for the purpose of commodity futures trading. This agreement provided that all transactions under it "shall be subject to the constitution, rules, regulations, customs and usages" of the involved exchange. It authorized SHS in its discretion and for whatever reason it might deem necessary for its protection to liquidate any open posi-

tions in the customer's account, with the customer to remain liable for any deficiency. It further provided that the customer would at all times maintain such margins as SHS would require.

SHS alleged that Leach had open positions in his commodity account in December soybean meal and November soybeans. These open positions became undermargined in early July 1974 at which time SHS allegedly made margin calls, requesting Leach to deposit funds in his account to margin the account properly. SHS introduced evidence that it had notified Leach every business day from July 1 through July 10 and that Leach had promised to forward payment promptly to meet the margin requirement. SHS's evidence further showed that by July 17 it gave Leach an ultimatum despite his repeated requests to maintain his account and not to liquidate it: either meet the margin requirement by the next day or SHS would liquidate the account. Leach did not comply. On July 18 SHS could not liquidate his account because the market went to "limit"[1] on both soybean meal and soybeans. SHS finally liquidated his account the next day resulting in the deficit for which SHS sued to recover.

Leach took the position at trial that SHS should have liquidated his account early in July when the market price was lower and that SHS's failure to liquidate sooner violated Chicago Board of Trade (CBOT) rules and SHS's own internal directives. He also disputed the evidence that he repeatedly attempted to forestall SHS from liquidating his account.

In this appeal, Leach raises several issues the most important of which involve allegedly improper jury instructions. He argues that Jury Instruction # 20 constitutes reversible error. That instruction stated that Leach could not assert improper actions of SHS as a defense if he ratified those actions, and that ratification may occur by his "failure to timely object to the broker's unauthorized course of conduct." The instruction concluded that

if you find by a preponderance of the evidence that . . . Leach had full knowledge of Shearson Hayden Stone's decision to delay liquidating the Leach account and he failed to object to such delay or even encouraged the same, then although such decision may have been originally unauthorized or contrary to the rules of the [CBOT], the defendant cannot now assert the wrongful action as a defense . . . .

Leach argues that this instruction withdrew from the jury the question of whether he *intended* by his failure to object to SHS's conduct to ratify that conduct. Thus, he argues, the trial court improperly instructed the jury that failure to object, alone, as a matter of law constitutes intent to ratify.

■ Although failure to object can constitute ratification if the trier of fact draws the inference from such silence that the principal intended to affirm the agent's conduct, silence is not as a matter of law sufficient to constitute ratification. *See Bell v. Cunningham*, 3 Pet. (U.S.) 69, 81–82, 7 L.Ed. 606, 611 (1830); Restatement of Agency Second, § 94, comment a; 3 Am. Jur.2d Agency, § 178. Therefore, we agree with Leach that the trial court erred in giving Instruction # 20.

■ We also note that in a strict sense, the legal doctrine of ratification does not apply to this case because it applies only when the agent (SHS) takes unauthorized actions which do not bind the principal (Leach) until the principal, who has the power to authorize the actions, later affirms those actions. In the present case, any lack of authority on the part of SHS to delay liquidation could not be cured by approval from Leach. The lack of authority alleged was that resulting from the rules of the CBOT regarding proper margin requirements. If SHS lacked authority to delay liquidation because the CBOT rules required it to maintain certain margin requirements with its customers, Leach could

---

1. The market goes to "limit" when the price rises the maximum permitted by law and trading stops because there are no sellers willing to sell at that price.

not supply SHS with authority via ratification.

■■ The legal doctrine described in instruction # 20 is more accurately labeled waiver. Although waiver is a flexible concept with no definite and rigid meaning, it is generally defined as an intentional relinquishment of a known right. *United States v. Chichester*, 312 F.2d 275, 281–82 (9th Cir. 1963). It is basically an equitable principle used by courts to avoid harsh results when a party has conducted itself in such a way as to make those results unfair. *L. Orlik Ltd. v. Helme Products Inc.*, 427 F.Supp. 771, 776 (S.D.N.Y.1977). As applied in the present case, if Leach had knowledge of SHS's decision to delay liquidation and intentionally failed to object, he would have waived his right to raise SHS's conduct as a defense. Characterizing the doctrine as waiver rather than ratification, however, does not cure the error. Intent is also a necessary element of waiver and if not express, may be inferred by the trier of fact. But inferring intent is a jury question and therefore should not have been removed from the jury as the trial court did with Instruction # 20. *See Metropolitan Paving Co. v. City of Aurora, Colorado*, 449 F.2d 177, 182 (10th Cir. 1971).

■ Having determined that the trial court erred in giving Jury Instruction # 20, we must now determine whether that error requires reversal of the judgment. Under Rule 51, Fed.R.Civ.P., a party may not assign as error the giving of an instruction unless he objects to the instruction before the jury retires to consider its verdict and unless he states distinctly the matter to which he objects and the grounds of his objection. Leach did not make a specific objection in the trial court to Instruction # 20 on the issue he now raises. His only objection was that ratification, being an affirmative defense, should not have been raised because it had not been pleaded. Although this court has the power to reverse for plain error in an instruction to which no party specifically objected, this power is exercised in only very rare circumstances where necessary to prevent a miscarriage of justice. *Appleyard v. Transamerican Press, Inc.*, 539 F.2d 1026, 1031 (4th Cir. 1976) (concurring opinion), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); 9 Wright & Miller, Federal Practice and Procedure, § 2558 at 672 (1971). Those circumstances are not present in the instant case, and thus the erroneous instruction does not constitute reversible error. In the instant case, if Leach had full knowledge of SHS's delay in liquidating, we do not regard it as likely that he would have failed to object unless he intended to approve or encourage that delay or to waive his right to raise it. He knew that a significant amount of money was at stake and, being a sophisticated investor, quite clearly did not remain silent out of inadvertence or lack of concern. As a result, the jury, if given the opportunity, would, it appears clear to us, have drawn the inference of intent from failure to object. Accordingly, we perceive no real miscarriage of justice resulting from the erroneous instruction.

Leach next argues that he is entitled to reversal of the judgment or at least a new trial because of the doctrine of avoidable consequences. This doctrine requires the non-breaching party in a contract case to take reasonable steps to mitigate damages after the breach, and prohibits that party from recovering those damages which it should have acted to prevent. *See, e. g., Commodity Credit Corp. v. Rosenberg Bros. & Co.*, 243 F.2d 504, 511–12 (9th Cir. 1957), *cert. denied*, 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed.2d 48. Leach contends that when he allegedly breached the customer agreement by failing to maintain adequate margins in his commodity account, SHS failed to mitigate damages by its delay in liquidating his account. From the day he went below his margin requirements to the day SHS liquidated his account, approximately 17 days, the price of soybean meal and soybeans rose thereby increasing the damages. If SHS had liquidated earlier, the damages would have been significantly lower.

■ The jury however, was instructed on the mitigation of damages doctrine. Jury Instruction # 32 stated in part:

Therefore, if you find that William Leach breached the customer agreement that existed between [SHS] and himself, [SHS] still may recover for only that part of the resulting damages, if any, that [SHS] could not reasonably have avoided by the exercise on its part of diligence to keep the resulting loss as low as possible.

Therefore, the jury apparently was not convinced that SHS should have liquidated earlier to mitigate damages. The jury certainly had evidence to support the position that SHS acted reasonably in not liquidating until July 19. SHS introduced evidence that Leach repeatedly during this period requested that SHS not liquidate his account and that he would deliver a check to cover his margin deficit immediately.[2] SHS's delay in liquidating was a reasonable response to such conduct because "if assurances are made that performance will be forthcoming, or if other circumstances indicate that the breaching party intends to perform, then, even though the contract has been breached, no duty to mitigate arises." *United States v. Russel Electric Co.*, 250 F.Supp. 2, 20 (S.D.N.Y.1965), and cases cited therein.[3] Thus although the jury heard conflicting evidence on this issue, there was sufficient evidence for the jury to conclude that SHS acted reasonably in not liquidating Leach's account before July 19, and accordingly that SHS did not violate its duty to mitigate damages.[4]

■ Leach next argues that the district court's failure to instruct the jury that SHS owed Leach a continuing fiduciary duty constituted prejudicial error. Although in some circumstances a broker would stand in a fiduciary relationship to its customer, those circumstances are not present here. Leach had a "nonsupervised" or "discretion-

2. Further evidence to support the position that SHS acted reasonably in not liquidating Leach's account earlier includes testimony that Leach was an experienced and sophisticated commodities futures investor, that he had met at least three substantial margin calls by SHS in the recent past, and that he was a wealthy man capable of absorbing large losses in the market, his purported net worth during February 1974 being approximately $3,300,000.

3. Leach also argued that Instruction # 20 on ratification contradicted Instruction # 32 on mitigation of damages because even if Leach's conduct ratified SHS's delay in liquidating, SHS still had a duty to mitigate damages by liquidating earlier. We disagree because the duty to mitigate damages does not apply when the breaching party gives assurances of performance.

4. Leach cites *Gordon v. duPont Glore Forgan Inc.*, 487 F.2d 1260 (5th Cir. 1973), *cert. denied*, 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666 (1974), and *Goldenberg v. Bache & Co.*, 270 F.2d 675 (5th Cir. 1959), as standing for the proposition that when a broker fails to liquidate an account to protect itself, it must bear any losses that would have been avoided had it liquidated before any point of deficit was reached. These cases do not support the proposition for which he cites them.

*Gordon* involved a broker that inadvertently omitted to notify a customer of an undermargined status. Although the customer was aware of his undermargined status, when the broker finally notified him of that status the customer refused to meet the margin call, and the broker liquidated his account resulting in a deficit. The Fifth Circuit held that the customer could not recover the $20,000 equity value that had been lost since the account first became undermargined, but that the broker could not recover the $1,500 deficit after liquidation because that loss was at least partially the result of the broker's failure to notify the customer of the undermargined status. In the present case, unlike in *Gordon*, the jury had sufficient evidence to establish that SHS did notify Leach of his undermargined status and that the delay in liquidation was attributable not to SHS's inadvertence, but to Leach's encouragement.

*Goldenberg* similarly is inapposite to the present case because it also involved a broker that negligently failed to notify a customer of an undermargined status.

Leach's attempt to derive support from these cases is further undercut by a recent Fifth Circuit opinion which states, that *Gordon* and *Goldenberg* are inapplicable to commodities cases such as the present case.

We believe that regulations promulgated by the Securities and Exchange Commission which have the force and effect of law pertaining to securities sufficiently differentiate those cases from this commodities case in which the futures market of short positions serves economically quite a different function in providing hedges to many facets of the commodity world.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks*, 548 F.2d 615, 616–17 (5th Cir. 1977), *cert. denied*, 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d 126 (1977).

ary" account with SHS which means that Leach made all the investment decisions. He was a sophisticated investor who did not rely on his broker for advice. In *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972), the plaintiff was a customer who maintained a nonsupervised commodity account with the defendant brokerage house. He alleged that he had incurred losses in the commodities market because of the defendant's negligent failure to advise him of material market information. The court stated:

> To make this defendant or any other broker the guardian of a customer such as the plaintiff would destroy an important part of the marketplace. . . .
>
> The defendant here was not an investment advisor and had *no fiduciary relationship* to the plaintiff which required relaying of any market information.

337 F.Supp. at 113 (emphasis added). Similarly, in the instant case there was no fiduciary relationship, and thus the district court properly refused to instruct the jury on such a relationship.

 The next issue Leach raises is the trial court's ruling that SHS's inter-office memorandum was inadmissible because irrelevant. This memorandum described the status of Leach's stock account with SHS in 1972 and 1973 and indicated that the account was liquidated because Leach failed to maintain his margin at the level of SHS's in-house margin requirement. Leach attempted to introduce this memorandum to show that on the basis of prior conduct he had good reason to expect SHS to liquidate his account when he delayed in meeting a margin call. Although we are of the opinion that the relevancy of this document is a close question, we are not prepared to say that the trial court judge abused his broad discretion in excluding it. *See Trans-Car Purchasing Inc. v. Summit Fidelity & Surety Co.*, 454 F.2d 788, 792 (7th Cir. 1971). He indicated that it was irrelevant because it concerned activities of nearly two years prior to the transactions in the present case and concerned stock rather than commodities transactions.

Even if the memorandum should have been admitted as relevant, its exclusion would be harmless error. There was evidence that Leach had been tardy in meeting large margin calls on his commodity account in June 1974. This more recent conduct involving Leach's commodity rather than stock account would have neutralized the significance of the conduct described in the excluded memorandum.

 Leach's last argument is that the verdict forms the jury was permitted to return were improper and confusing. Jury Instruction # 33 contained three verdict forms. The first was to be used if the jury found in all respects for SHS and stated damages of $473,563.32. The second was to be used if the jury found in all respects for Leach. The third was to be used if the jury found for SHS on the complaint and for Leach on the counterclaim *or on the affirmative defenses.* This last form left blank the amount of damages and the party to whom they were to be awarded.

Leach argues that the first form deprived the jury of the opportunity to award a lesser amount of damages that it might have decided was appropriate because of SHS's failure to mitigate damages. But, as the trial judge explained during the instruction conference, and as appears obvious to us, if the jury wished to award less than the full amount because of SHS's failure to mitigate damages, it could have used the third form. Leach contends that this presents a confusing inconsistency between the first and third forms. We disagree, and moreover, perceive no confusion whatsoever from the three verdict forms.

For the reasons stated herein the judgment of the district court is

AFFIRMED.