Louis E. WOLFSON, Plaintiff,

v.

John D. BAKER, Jr., et al., Defendants.

No. 70–1036–Civ–J–T.

United States District Court,
M. D. Florida,
Jacksonville Division.

Jan. 20, 1978.

William H. Maness, Jacksonville, Fla., Roy Cohn, Saxe, Bacon & Bolan, P. A., New York City, for plaintiff.

Thomas M. Baumer, Mahoney, Hadlow & Adams, Jacksonville, Fla., for defendants.

## OPINION

MELTON, District Judge.

This is a case which began on December 17, 1970, with the filing of a one-count complaint purporting to state an implied, private claim under the federal securities laws. To date, no answer has been filed on behalf of the defendants. Instead, the defendants have moved several times to dismiss the complaint, to obtain a more definite statement of the plaintiff's allegations, or for summary judgment on the merits. As a result, the cause is presently before the Court on the plaintiff's third amended complaint, filed on February 14, 1975, and the defendants' responsive motion to dismiss or, in the alternative, for summary judgment. By prior order of this Court, discovery to date has been limited to mat-

ters germane to these threshold proceedings. For the reasons set forth below, this Court has concluded that the defendants' motion is well taken, and accordingly the Court will grant their motion—in some respects through a dismissal with prejudice, and in other respects through a summary judgment on the merits.

## PLAINTIFF'S ALLEGATIONS

The plaintiff's third amended complaint sets forth four counts. Although it alleges a plethora of named defendants, there are only two real defendants in this case: (1) Reynolds & Company (hereinafter "Reynolds"), a New York partnership which engages in the securities brokerage business, and (2) the estate of John Morley, who prior to his death acted as the plaintiff's stockbroker for a number of years.[1] Essentially, it is the actions of John Morley which underlie all of the plaintiff's claims.

Count I of the third amended complaint purports to state a private, implied right-of-action arising under the Securities Exchange Act of 1934 and certain rules and regulations of the Securities and Exchange Commission (hereinafter "SEC"). This count alleges in pertinent part that (1) beginning in 1943, John Morley acted as the stockbroker for the plaintiff Wolfson and his business associates; (2) that prior to June 1963 Morley was employed by the brokerage firm of A. M. Kidder & Company (hereinafter "Kidder"); (3) that after June of 1963 Morley was employed by the defendant Reynolds; (4) that at all times during their broker/customer relationship Morley (and, vicariously, the defendant Reynolds) owed the plaintiff a duty of care by virtue of (a) a series of signed agreements known as "broker/customer" agreements, setting forth certain terms and conditions of the relationship, and (b) Rule 405 of the New York Stock Exchange, the terms of which are fully set forth hereinafter; (5) that in connection with certain sales by the plaintiff of his capital stock in Continental

---

1. When the first complaint in this case was filed, Morley was still alive and was named as a defendant. Morley died during the pendency of these proceedings, and his estate was substituted as a party by an order of this Court entered on August 28, 1973.

Enterprises, Inc. (hereinafter "Continental"), the duty of care enumerated in item (4) *supra* was "recklessly disregard[ed]"; (6) that as a proximate result of (5) the plaintiff was indicted and convicted in the United States District Court for the Southern District of New York on September 29, 1967, for violating section 5 of the Securities Act of 1933 [15 U.S.C. § 77e (1970)]; (7) that as a further proximate result of (5) the plaintiff has been joined as a party defendant in four civil suits brought in Kentucky and New York by shareholders of Continental claiming damages in excess of two million dollars; and (8) that the plaintiff has, as a result of his criminal conviction, sustained certain specified damages. Count I admits that prior to June of 1963 the defendant Morley was employed not by the defendant Reynolds but by Kidder, but this count also alleges that Reynolds succeeded to the liabilities of Kidder when it acquired certain of Kidder's assets in 1963.

Count II also purports to state an implied private claim under the Securities Exchange Act of 1934. It realleges much of Count I verbatim, but by its terms is limited to the transactions in Continental stock occurring after June of 1963—the date when Reynolds bought out Kidder's Jacksonville office and employed John Morley—and seeks to recover for those transactions in Continental stock for which Reynolds is liable as the direct employer of Morley, *i. e.*, independent from whatever liabilities Reynolds might have succeeded to when it acquired Kidder's Jacksonville assets.

Count III purports to state claims under both federal and state law, invoking the Court's pendent jurisdiction as to the latter claims. It alleges that while acting on behalf of Kidder and the defendant Reynolds, the defendant Morley willfully and fraudulently misrepresented to the plaintiff that he could engage in the purchase and sale of stock in Continental and three other corporations without running afoul of the prohibitions of any federal or state securities laws. Count III further alleges that the defendants' fraudulent misrepresentations proximately resulted in the criminal conviction and civil litigation previously recounted, and the damages incurred thereby.

Count IV alleges that, under state law, Wolfson is entitled to recover punitive damages for the transgressions alleged in the preceding three counts. This count is wholly dependent upon the Court's exercise of its pendent jurisdiction, since no claim is asserted under federal law.

From the foregoing, it should be apparent that the plaintiff relies heavily upon his criminal trial and conviction to support his cause of action. The criminal conviction comprises the cornerstone of his claim for damages; the only injuries alleged, aside from that conviction, are those incurred in defending the four civil suits instituted by Continental shareholders. In the Court's view, Wolfson's criminal trial and conviction are of critical importance here, not only as an essential element (i. e., actual injury) of Wolfson's cause of action, but also because the prior trial conclusively establishes certain facts for the purposes of this case through the operation of the collateral estoppel doctrine. In fact, ·the Court's analysis of this case hinges upon collateral estoppel principles, and the effects of those principles on the merits of this case.

### COLLATERAL ESTOPPEL

■ In analyzing the possible collateral estoppel effects of Wolfson's 1967 criminal conviction, it has been necessary for the Court to review the record of that case in some detail. It is, of course, a fundamental precept of the collateral estoppel doctrine that that doctrine can operate only as to those facts which have been actually litigated and necessarily determined in a prior proceeding. *See generally* 1B J. Moore, Federal Practice § 0.441 (2d ed. 1974). For summary judgment purposes, the defendants have offered as an exhibit a certified copy of the record of Wolfson's criminal case, and the Court has examined this exhibit closely. Upon reflection, the Court is convinced that, by operation of the collateral estoppel doctrine, at least one crucial fact is conclusively established for the purposes

of this case: the plaintiff Wolfson is estopped to deny that, at the time of the stock transactions alleged in the indictment upon which he was tried and convicted, he knew that the securities laws required that he file a registration statement before engaging in those transactions.

The Court will hereinafter examine the implications of this fact in the context of the instant case. Preliminarily, however, the Court should detail the reasons underlying its conclusion that collateral estoppel precludes Wolfson from denying that he knew of the illegality of the transactions which led to his criminal conviction.

The indictment upon which Wolfson was tried and convicted contained nineteen counts. Count One alleged that Wolfson had conspired with various other persons to violate sections 5 and 24 of the Securities Act of 1933, 15 U.S.C. §§ 77e and 77x (1970). Counts Two through Nineteen alleged substantive violations of the same statutes in connection with eighteen specified sales of large blocks of stock in Continental Enterprises, Inc., allegedly executed at Wolfson's direction between October 5, 1961, and January 9, 1962. Succinctly stated, the gravamen of the government's case was that Wolfson's (and his close associates') holdings in Continental stock[2] were substantial enough to require the filing of a registration statement with the SEC as a condition precedent to Wolfson's sale of his Continental stock in such large quantities during such a short period of time. It was undisputed that the sales of stock in question were not accompanied by any registration statement. As a predicate for Wolfson's criminal liability, the terms of 15 U.S.C. § 77x (1970) required that the government prove—beyond a reasonable doubt, of course—that Wolfson's failure to file the requisite documents with the SEC was a willful act on Wolfson's part.

Much of the government's case against Wolfson rested on undisputed facts. No one denied that the alleged sales of Continental stock had been made. In fact, no one seriously challenged the government's assertion that the sales in question ran afoul of the securities laws due to the lack of an accompanying registration with the SEC. Wolfson's defense focused almost entirely upon the willfulness element of the crimes alleged—briefly put, Wolfson claimed ignorance. He maintained that while, perhaps, technical violations of the law had occurred, he had had no knowledge of any illegality in connection with the Continental stock sales.

The issue of whether Wolfson actually knew that his sales of Continental stock were legally deficient was, by far, the most hotly contested issue at Wolfson's trial. During its case-in-chief, the government called a number of securities brokers through whom Wolfson (or one of his associates) had sold various blocks of Continental stock. In the case of most of these brokers, Wolfson's sell orders had been relatively small. Defense counsel cross-examined each broker thoroughly on the subject of whether he had discussed the registration question with Wolfson or one of his subordinates, and none could recall having had any such discussions. With only one exception, the defense made no attack on the credibility of the brokers' testimony.

The one exception was the testimony of John Morley. During the time period alleged in the indictment, Morley had been a registered broker with the firm of A. M. Kidder & Company, a brokerage house with its principal offices in New York City. Morley was with Kidder's Jacksonville office, and had in fact been one of Wolfson's stockbrokers for a number of years prior to the allegedly illegal sales of Continental stock. It was with Morley that Wolfson placed the most substantial sell orders for his shares of Continental.

The defense strategy was to depict Morley as the one person who should have

2. At Wolfson's trial, the government adduced evidence (which was undisputed) that Wolfson and his associates—sometimes referred to as the "Wolfson group"—owned or controlled about 40% of the Continental stock then outstanding. The remainder of Continental was owned by about 5,000 members of the public.

recognized the registration problems in the Continental transactions and should have informed Wolfson of these problems. In furtherance of this strategy, the defense position was that while Morley knew of or should have known of the applicable registration requirements, he neglected to call the requirements to Wolfson's attention for fear of aborting the transactions and losing the rather substantial commissions which Wolfson's Continental sales had generated.

After the government had rested its case, the defense continued its strategy of casting doubt upon whether Wolfson had known the illegal nature of what he was doing. In this connection, the crucial witness was Wolfson himself. After first calling several stockbrokers, an investment consultant, and a multitude of character witnesses,[3] Wolfson took the stand and flatly denied any knowledge of the legal shortcomings of his Continental sales. As an example of the tenor of Wolfson's testimony, the record discloses the following exchange between Wolfson and his defense counsel during direct examination:

[DEFENSE COUNSEL:] You told Mr. Gerbert [Wolfson's close business associate and codefendant] to sell approximately 50,000 shares, is that right?

[WOLFSON:] Whatever it was, yes, sir.

Q: Did you tell him what brokerage firm to use?

A: No, sir.

Q: Did he ever report to you that he had any difficulty selling the stock?

A: No, sir.

Q: Did he ever mention to you any conversation that he had with Mr. Morley on the subject of selling this stock?

A: No, sir.

Q: Did you ever hear one word about any problem connected with the sale of Continental Enterprises stock in 1954, 1955 or at any time up to 1960?

A: No, sir.

Q: Did Mr. Morley ever call you and raise any question?

A: No.

Q: Any broker ever call you and raise any question?

A: No.

Defendants' Exhibit B, vol. 13 at 1988–89. Although this colloquy pertains to stock sales prior to the period alleged in the indictment, Wolfson's claims of ignorance were no less vehement during his testimony regarding the actual sales for which he was on trial.

When the defense had rested, the government succeeded in introducing a damning piece of rebuttal evidence. The government produced an internal memorandum, dated in 1950, from the files of the SEC. The memorandum tended to indicate that at that time Wolfson had met with SEC officials and had discussed the federal registration requirements pertaining to a transaction substantially similar to Wolfson's Continental sales. The memorandum was introduced, of course, to show that Wolfson was well aware of the legal restrictions on his unregistered sale of the Continental stock.[4]

**3.** These "character" witnesses were called for the purpose of establishing Wolfson's reputation in the community for truthfulness. The witnesses were tendered under the rule of evidence now codified in Rule 608(a), Fed.R.Ev. A substantial number of witnesses was called for the sole purpose of establishing Wolfson's reputation for truth and veracity, and the list was impressive. It included many figures of national or local prominence, including sports figures Joe DiMaggio and Sid Luckman, television personality Ed Sullivan, and former Florida governor Fuller Warren.

**4.** Although the validity of the 1950 SEC memorandum was not forcefully challenged at Wolfson's criminal trial, the document was later the subject of considerable controversy. During the pendency of Wolfson's direct appeal from his criminal conviction, he alleged before the district court that the 1950 memorandum was spurious and moved for a new trial on that basis. The district court granted Wolfson an *evidentiary hearing on his motion.* This hearing lasted for six days and was comprised, for the most part, of expert testimony. After the hearing was concluded, the district court entered a written order finding the document to be authentic and denying Wolfson's motion for a new trial. *United States v. Wolfson,* 297 F.Supp. 881 (S.D.N.Y.1968). The district court's ruling was appealed to the Second Circuit and affirmed. *United States v. Wolfson,* 413 F.2d 804 (2d Cir. 1969).

Not surprisingly, the closing arguments of counsel focused heavily on the issue of Wolfson's knowledge of the securities laws which he had allegedly violated. Defense counsel skillfully summarized the evidence in the case which tended to show Wolfson's ignorance, and in fact devoted the bulk of his argument to this very subject. Subsequent to the closing arguments, the trial court instructed the jury at some length, and included specific and comprehensive instructions on the knowledge/willfulness issue. Eventually, the jury returned a guilty verdict against Wolfson as to all nineteen counts of the indictment. Wolfson's conviction was later affirmed on direct appeal, *United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968), and the United States Supreme Court denied the ensuing petition for writ of certiorari. *Wolfson v. United States*, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

From this Court's examination of the record in Wolfson's criminal case, it is abundantly clear that Wolfson's knowledge of the registration requirements in connection with his sale of Continental stock was an exhaustively litigated issue, and that the jury's verdict against Wolfson necessarily rests upon a finding that Wolfson's claims of ignorance were insufficient to create a reasonable doubt of his criminal culpability. What this Court must now determine is whether principles of collateral estoppel bind Wolfson to the position that he knew of the illegality of his Continental sales, and, if so, to what extent this fact bears on the merits of the cause of action which he urges before this Court.

It is by now well settled that, subject to certain limitations, a party convicted in a criminal proceeding may be estopped, in a subsequent civil proceeding, to relitigate those "questions 'distinctly put in issue and directly determined' in the criminal prosecution." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). For a considerable length of time, concepts of mutuality of estoppel limited collateral estoppel effects to those cases where the parties to the subsequent suit were identical to, or in privity with, the parties in the prior litigation. The recent developments in the collateral estoppel doctrine, however, have relaxed the more technical aspects of the mutuality and privity restrictions, and have tended to favor a more pragmatic approach. The Fifth Circuit has stated that, regardless of mutuality principles, collateral estoppel may nevertheless be invoked where

it appears that the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and that application of the doctrine will not result in an injustice to the party against whom it is asserted under the particular circumstances of the case.

*Rachal v. Hill*, 435 F.2d 59, 62 (5th Cir. 1970), *cert. denied*, 403 U.S. 904, 91 S.Ct. 2203, 29 L.Ed.2d 680 (1971).[5] These same principles apply where, as here, the basis for applying collateral estoppel principles is a prior criminal proceeding against one of the parties. *See, e. g., Breeland v. Security Insurance Co. of New Haven*, 421 F.2d 918, 921–23 (5th Cir. 1969); *Cardillo v. Zyla*, 486 F.2d 473, 475–76 (1st Cir. 1973).

Under the circumstances of this case, the Court concludes that it is appropriate to apply collateral estoppel to establish that Wolfson knew that the sale of his Continental stock ran afoul of the federal securities laws. It is difficult to imagine how this issue could have been more fully litigated

---

5. Under the circumstances present in the *Rachal* case, the Fifth Circuit held that the district court had inappropriately applied the collateral estoppel doctrine in rendering a summary judgment for the plaintiffs. As the basis for their collateral estoppel argument, the plaintiffs had invoked a prior injunctive proceeding brought against the defendants by the SEC in which the defendants had been found to have violated certain securities laws. Since the prior suit was equitable in nature, thus depriving the defendants of the opportunity to have their guilt or innocence determined by a jury, the Fifth Circuit felt it inappropriate to utilize that proceeding to determine the defendants' liability for the purposes of the subsequent civil suit. In Wolfson's case, of course, the defendants invoke prior litigation in which Wolfson was fully accorded his right to a jury trial.

than it was during Wolfson's criminal trial. If Wolfson declined to present any exculpatory evidence which was at his disposal, he did so at the risk of sustaining a criminal conviction. The record of his trial strongly suggests that nothing was held back, since as the Court has already recounted the primary defense theory was that Wolfson's violations of the law were not willful. Hence, for the purposes of this summary judgment motion, the Court holds that collateral estoppel precludes the existence of any genuine issue of fact regarding Wolfson's knowledge of the unlawful nature of his unregistered sales of Continental stock.

## WOLFSON'S IMPLIED FEDERAL CLAIM UNDER NEW YORK STOCK EXCHANGE RULE 405

Having established that Wolfson knew that the sales were illegal, the Court must now consider what effect this has on the merits of Wolfson's case. Toward this end, the Court should first examine the theory of recovery asserted in the plaintiff's complaint as the basis for a federal cause of action.

■ Counts I and II of the third amended complaint purport to invoke only this Court's federal question jurisdiction. Generally speaking, Count I alleges (1) that the defendants, both directly [6] and indirectly [7], owed the plaintiff a certain duty of care [8] with respect to the defendants' handling of the plaintiff's sales of the Continental stock; (2) that the defendants breached their duty of care in the Continental transactions; and (3) that as a proximate result of that breach, the plaintiff sustained certain damages arising out of (a) his criminal trial and conviction and (b) ensuing civil

---

**6.** The individual defendant John Morley is alleged to be the chief perpetrator of the injuries suffered by the plaintiff.

**7.** Reynolds is alleged to be liable for the acts and omission of John Morley under the *respondeat superior* doctrine. The liability of Reynolds alleged in Count I, in fact, is doubly vicarious; it is alleged to arise because (1) Morley's wrongs were attributable to his employer, Kidder, through agency principles, and (2) Kidder's liabilities in that connection were attributable to Reynolds because Reynolds ultimately succeeded to all of Kidder's liabilities when it acquired Kidder's Jacksonville operation in 1963. Whether Reynolds did in fact succeed to these liabilities is still an open question. See fn. 9 *infra*.

**8.** As the Court construes this portion of Wolfson's complaint, Wolfson specifically asserts two items as the basis for the duty of care owed him by the defendants: (1) the broker/customer agreements between him and Kidder and between him and Reynolds; and (2) Rule 405 of the Rules of the New York Stock Exchange. The defendants' potential liability under Rule 405 will receive extensive treatment in the body of this opinion. Since the broker/customer agreements are not specifically treated in that portion of the Court's opinion, it seems advisable to advert briefly to the analysis which the Court has used in connection with these agreements.

As they relate to a potential *federal* cause of action, the various broker/customer agreements are of only limited relevance. To the extent that any broker/customer agreement between Kidder and Wolfson, or between Reyn-

olds and Wolfson, may underlie a garden-variety breach of contract action, Wolfson cannot invoke this Court's federal question jurisdiction in his efforts to obtain relief. Standing alone, the contract between a broker and his customer will usually involve only matters of state law. (One exception, embodied in 15 *U.S.C.* § 78cc (1970), is not even colorably applicable in this case.) Thus, any alleged breach of contract would be cognizable in this Court only upon the invocation of the Court's pendent jurisdiction. Insofar as Wolfson might rely upon his various broker/customer agreements to support a straightforward breach of contract action, the Court declines to exercise its pendent jurisdiction. The Court's reasoning is recounted in connection with its discussion of Counts III and IV of the complaint *infra*.

As the Court views it, then, the broker/customer agreements are relevant to a potential federal cause of action only insofar as they help illuminate the contours of the standard of care owed Wolfson by the defendants. As far as a federal claim is concerned, the same policy limitations (discussed *infra*) which operate to preclude Wolfson's recovery under Rule 405 similarly operate when the broker/customer agreements, rather than Rule 405, are used to establish the applicable standard of care. The gist of the Court's holding is that Wolfson's indisputable knowledge of the illegality of the relevant stock transactions forecloses the possibility of his recovery on a private claim implied under the federal securities laws. This foreclosure exists, of course, regardless of what standard of care is used to evaluate the defendants' conduct.

litigation brought against him on behalf of the ultimate purchasers of Continental stock. To establish the duty of care allegedly owed him by the defendants, Wolfson cites the "Customer's Agreements" between, on the one hand, A. M. Kidder & Co. and, on the other hand, Wolfson and various of his family members and business associates. These agreements are form documents wherein Kidder agrees, upon certain terms and conditions, to act as broker for the persons named. A sample copy of a typical customer agreement is attached to Wolfson's complaint as an exhibit. Additionally, Wolfson seeks to establish the defendants' duty of care by reference to the rules of the New York Stock Exchange (hereinafter NYSE), particularly Rule 405, the so-called "Know Your Customer" rule. Rule 405 reads as follows:

> Every member organization is required through a general partner or an officer who is a holder of voting stock to
> (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.
> (2) Supervise diligently all accounts handled by registered representatives of the organization.
> (3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer, provided, however, that in the case of branch offices, the opening of an account for a customer may be approved by the manager of such branch office but the action of such branch office manager shall within a reasonable time be approved by a general partner or an officer who is a holder of voting stock in the organization. The member, general partner or officer approving the opening of the account shall, prior to giving his approval, be personally informed as to the essential facts relative to the customer and to the nature of the proposed account and shall indicate his approval in writing on a document which is a part of the permanent records of his office or organization.

Wolfson's claim in Count I and II is that, taken together, the Customer Agreement and Rule 405 provide the basis for a federal cause of action against Wolfson's former brokers.[9]

▮ In essence, Wolfson's federal claim is predicated upon the existence of a private, implied right-of-action against his securities brokers arising under the Securities Exchange Act of 1934. For some time now,[10] the federal courts have entertained private litigation over alleged violations of the federal securities laws, recognizing that the purposes and policies of the securities

**9.** There exists some genuine controversy over whether Reynolds could be held liable for the acts or omissions of John Morley occurring prior to 1963, the time when Reynolds purchased at least some of the assets of Kidder's Jacksonville office. Until that acquisition, Morley was associated with Kidder's Jacksonville operation, and he did not enter the employ of Reynolds until after Reynolds had bought out Kidder's Jacksonville office. Wolfson has alleged that Reynolds succeeded to Kidder's liabilities when it purchased the Kidder assets in question, and in the Court's view this allegation raises real questions of both law and fact. The Court has not been presented with evidentiary material sufficient to preclude a genuine issue of fact on the succession-of-liability question. Due to the Court's analysis of Wolfson's claim against Kidder, however, it is immaterial whether Reynolds could be held vicariously liable for the acts or omissions of John Morley while he was with the Kidder office. Thus, the presence of a genuine issue of fact does not foreclose the possibility of summary judgment, since the fact in issue is immaterial to the Court's resolution of this matter. *See Robbins v. Gould,* 278 F.2d 116, 120 (5th Cir. 1960); *Hahn v. Sargent,* 523 F.2d 461 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). For the purposes of the instant motions, the Court will assume (without deciding) that Reynolds did in fact succeed to the liabilities of Kidder.

**10.** The first reported case upholding an implied private right of action under the federal securities laws was *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946) (finding private cause of action under section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 of the SEC).

laws can be effectively furthered by private as well as by governmental litigation. *See generally J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The access to federal courts for the vindication of private rights under the securities laws, however, is far from unlimited. As a threshold matter, *Borak* and its progeny dictate that the federal courts examine individual claims in the light of the policies to be served by the securities laws; if particular plaintiffs assert a claim consistent with the furtherance of federal policy in the securities field, then the courts are not reluctant to imply private causes of action for the purposes of federal question jurisdiction.

■ Moreover, the existence of federal jurisdiction is not contingent solely upon alleged violations of the securities statutes or the rules promulgated thereunder by the Securities and Exchange Commission. Although the applicable statute, section 27 of the Securities Exchange Act of 1934[11], grants federal jurisdiction over suits "brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder", certain privately promulgated rules have been held to be "duties created by [the Securities Exchange Act of 1934]", and thus appropriately supportive of federal jurisdiction when they are allegedly breached. Chiefly, the reported cases involve alleged transgressions of certain internal rules of the NYSE. The theory of recovery under these rules of the Exchange was first articulated in Judge Friendly's widely-quoted dictum in *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), and since that time numerous federal courts have had occasion to examine whether a private, federal cause of action can be grounded upon an alleged

breach of NYSE rules. *See, e. g., McCormick v. Esposito,* 500 F.2d 620 (5th Cir. 1974); *Gordon v. duPont Glore Forgan, Inc.,* 487 F.2d 1260 (5th Cir. 1973); *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790 (7th Cir. 1977); *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir.), *cert. denied,* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); *Utah State Univ. of Agriculture & Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir. 1977); *Rolf v. Blyth Eastman Dillon & Co., Inc.,* 424 F.Supp. 1021 (S.D.N.Y.1977); *cf. Landy v. FDIC,* 486 F.2d 139 (3d Cir. 1973) (question of recovery under Rule 405 reserved).

In this case, Wolfson relies principally upon Rule 405 as the basis of his recovery in Counts I and II of his complaint. The defendants have moved to dismiss these counts under Rule 12(b)(6), Fed.R.Civ.P.[12], because these counts failed to allege any fraud in connection with, and in addition to, the alleged breach of Rule 405. The defendants quite accurately point out the absence of any decision in which a federal court has sustained a private action for the breach of a stock exchange rule where there is no fraud alleged in connection with such breach. In fact, the prevalent view seems to hold that fraud is a necessary element of a plaintiffs' federal cause of action for a violation of a stock exchange rule. *See Sanders v. John Nuveen & Co., Inc., supra; Utah State Univ. of Agriculture & Applied Science v. Bear, Stearns & Co., supra.*

■ It is quite true that Wolfson's third amended complaint contains no allegation of fraud on the part of John Morley, Kidder, or Reynolds. It is also true, however, that each of Counts I and II alleges that Morley and the brokerage firms violated Rule 405 "with reckless disregard of" the

---

**11.** 15 U.S.C. § 78aa (1970).

**12.** Which provides in pertinent part that a party may raise by motion the defense of "failure of the pleading to state a claim upon which relief can be granted."

Although the Court's disposition of the defendants' motion for summary judgment makes it technically unnecessary to decide the "fraud"

issue raised by the motion to dismiss, the Court feels that it should articulate its views on this matter in the event an appeal is taken. At the appellate stage, a reversal of this Court's ruling in favor of the defendants' motion for summary judgment would be likely to necessitate reaching the "fraud" issue raised in the defendants' motion to dismiss.

duty imposed by that rule.[13] Thus, Wolfson has alleged more than merely negligent behavior on the defendants' part, but less than full-blown fraudulent misconduct. The question which this Court must resolve for the purposes of the defendants' motion to dismiss, then, is whether an allegation of reckless misconduct sufficiently meets the *scienter* element of a cause of action under Rule 405.[14]

In this Court's opinion, a reckless disregard of the duty imposed by Rule 405 is sufficient to sustain a cause of action for a breach of that rule.[15] Rule 405 imposes upon securities brokers broad obligations to learn the essential facts with respect to "every customer [and] every order," and the rule is obviously designed to further the protection of the investing public by requiring the (presumably more sophisticated) investment broker to take certain steps to determine whether the public—or the broker's customer—may be jeopardized by a given transaction. It seems clear to the Court that circumstances can exist—and, for the purposes of the defendants' 12(b)(6) motion, the Court is bound to presume that they *do* exist—under which a broker's obligations to know his customer may be so recklessly disregarded as to be tantamount to fraud. As another court has written in a similar context, meeting the "tantamount to fraud" standard

> would mean that the violations operated as a fraud upon the plaintiff and that the

defendants acted with *scienter*, that is, with intent to defraud or with willful and reckless disregard for the truth . . ..

*Rolf v. Blyth Eastman Dillon & Co., Inc.,* 424 F.Supp. 1021, 1041 (S.D.N.Y.1977). In other words, if the defendants were actually aware of the potential legal shortcomings of Wolfson's Continental transactions, but recklessly disregarded those potential shortcomings, it is the Court's view that Wolfson could recover, under Rule 405, whatever damages he sustained as a result of the defendants' recklessness (assuming, of course, that the other elements of his claim have been proven). For that reason, the defendants 12(b)(6) motion to dismiss will be denied.

■ Turning to the defendants' motion for summary judgment, the Court reiterates that Wolfson is estopped to deny that he knew of the registration requirements in connection with his sales of Continental stock. Through the collateral estoppel doctrine, the Court treats that fact as proven as a matter of law. The question then becomes whether Wolfson can prevail on the merits of Counts I and II of his complaint under any set of circumstances, once it is established that he knew of the illegality of his Continental transactions. In the Court's opinion, he cannot.

No reported Fifth Circuit case has squarely dealt with the elements of a private Rule 405 claim, or with the possible

---

13. Plaintiff's Third Amended Complaint, Count I at ¶ 19; *id.* Count II at ¶ 18.

14. In a recent case, the Supreme Court reserved the question of whether recklessness meets the *scienter* element of a private cause of action based on section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 CFR § 240.10b–5 (1977). *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Subsequent to that decision, at least one Circuit has held that it does. *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 792 (7th Cir. 1977).

15. In this connection, the Court views the recklessness standard as a far more stringent one than that of mere, or even extreme, negligence. As one court has stated in another context,

reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading· buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Franks v. Midwestern Oklahoma Development Authority,* CCH Fed.Sec.Rep. 95.786 at 90.850 (W.D.Okl.1976). Thus, in order to prove that the defendants' conduct was "reckless" in this context, Wolfson would have to prove that they actually knew or should have known that Wolfson was required to register his Continental sales, and that their failure to inform him of this fact represented at least "an extreme departure from the standards of ordinary care."

defenses thereto. Two cases, however, appear sufficiently analogous to inform this Court's view of the law in this area. In *Kuehnert v. Texstar Corp.,* 412 F.2d 700 (5th Cir. 1969), the plaintiff was a "tippee" who sought to recover, upon Rule 10b–5, from the insider who had supplied him with allegedly misleading information and the corporation in which he had invested. The district court had granted summary judgment for the defendants, *Kuehnert v. Texstar Corp.,* 286 F.Supp. 340 (S.D.Tex.1968), and the Fifth Circuit affirmed. The court concluded that the district court had properly invoked the doctrine of *in pari delicto* to bar the plaintiffs' recovery, reasoning that as a matter of policy a knowing party to a wrongdoing should not be allowed to recover against others equally guilty of the wrongdoing. A more closely analogous case is *Gordon v. duPont Glore Forgan, Inc.,* 487 F.2d 1260 (5th Cir. 1973). In *Gordon,* a group of investors sued their broker for an alleged failure to notify them that their accounts had become undermargined. The plaintiffs argued that the court should imply a private cause of action under NYSE Rules 431 and 432, which prescribe certain substantive and record-keeping requirements in connection with brokers' maintenance of margin accounts. On appeal from a judgment in favor of the defendants,[16] the Fifth Circuit declined to reach the question of whether a private right of action exists for a breach of the NYSE rules in question. Instead, the Fifth Circuit pointed out that, as an undisputed fact, the plaintiffs knew that their accounts had become undermargined but acquiesced in the situation. The court then held that, even assuming that NYSE Rules 431 and 432 may undergird a private cause of action, the plaintiffs could not recover on that theory because they had had knowledge of the breach and had acquiesced therein. In effect, said the court, the investors and their brokers were *in pari delicto,* and for policy reasons the plaintiffs ought not to be allowed to recover under such circumstances.

In this Court's view, these two cases—particularly *Gordon*—strongly militate against allowing Wolfson to recover under the circumstances of this case. Wolfson's position vis-á-vis the broker/defendants is substantially similar to that of the *Gordon* plaintiffs. Since Wolfson actually knew that his Continental sales were legally deficient, it is the opinion of this Court that he cannot be heard to complain that his brokers recklessly failed to learn of and advise him of this legal deficiency.

To a great extent, the Court's conclusion that Wolfson's knowledge of the illegality of his Continental sales operates to bar his recovery under NYSE Rule 405 ultimately hinges upon an analysis of that rule itself. The Court is acutely aware of the fact that when it considers whether or not to imply a private remedy for the breach of the securities laws—or for that matter, any body of federal law which does not specifically provide for a private cause of action—a critical factor is whether the plaintiff is a member of the class which the laws in question were designed to protect. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). It seems clear to the Court that NYSE Rule 405 was promulgated primarily for the protection of the innocent investor. The critical prescription for the purposes of this litigation appears in subsection (1), which directs the broker to "use due diligence to learn the essential facts relative to every customer [and] every order. . . ." This subsection clearly recognizes that the broker's professional experience can furnish the investing public with an important safeguard against the pitfalls which necessarily exist in the complex legal and economic climate of the securities market.

In connection with the events alleged in his complaint, Wolfson simply cannot bring himself within the class of persons which Rule 405(1) was designed to protect. While

---

**16.** Although the lower court had entered a judgment in favor of the defendants as to the plaintiffs' claims based on the NYSE rules, the lower court had also entered a judgment in the plaintiffs' favor based upon pendent state claims of breach of common-law fiduciary duty. The Fifth Circuit reversed this aspect of the district court's decision.

he may argue that he was a member of the investing public at large, which he certainly was, his Rule 405 allegations sound on behalf of a narrower class of persons: those who may, for lack of knowledgability, needlessly suffer the consequences of their ignorance in a given transaction where the broker's due diligence in seeking out the facts of the matter would have avoided those consequences. For this reason, Wolfson's knowledge of the facts and the law of his Continental transactions precludes his recovery under Rule 405.[17]

## SPECIFIC ALLEGATIONS OF THE THIRD AMENDED COMPLAINT

■ Since the Court has considered the fundamental theory of recovery underlying Wolfson's complaint and found that theory unavailable to Wolfson in the context of this case, all that remains is to examine the third amended complaint on a count-by-count basis and to express the Court's disposition of the case as to each of these counts.

In Count I, Wolfson seeks to recover from the defendants the damages allegedly caused by the defendants' reckless failure to inform him of the federal registration requirements in connection with his sales of Continental stock. Wolfson alleges that the defendants' breach of their duties proximately resulted in his indictment and conviction in the Southern District of New York, as well as his joinder as a party defendant in four derivative actions brought by shareholders of Continental stock. No specific time period is alleged.

It is apparent that Wolfson cannot recover on this count of the complaint. As the Court has already discussed in some detail, Wolfson's knowledge of the illegality of his Continental sales effectively bars his recovery from the brokers who executed those sales. Even though the complaint is chronologically open-ended, so that the Court assumes that Wolfson's complaint is grounded upon Continental sales occurring subsequent to those underlying his criminal conviction, the critical fact of Wolfson's knowledge is conclusively established for all sales of Continental stock. Therefore, the defendants' motion for summary judgment with respect to Count I will be granted.

Count II is, by its terms, substantially similar to Count I and asserts the same basis for recovery. The only characteristic which distinguishes Count II from the prior count is that Count II is concerned with Wolfson's Continental sales executed after June 3, 1963 (the date when Reynolds took over the Kidder office), and seeks to recover against Reynolds only on the basis of John Morley's conduct while he was actually a Reynolds employee. Since Count II asserts the same grounds for recovery as Count I, the reasons previously articulated dictate a judgment for Reynolds on this count. Accordingly, the defendants' motion for summary judgment will be granted as to Count II.

Count III asserts two alternate bases of recovery. First, it alleges an implied federal cause of action against the defendants similar in principle to the theories underlying the previous two counts. Alternatively, Count III invokes this Court's pendent jurisdiction and seeks recovery under state

---

**17.** While the Court's reasoning may suggest the applicability of the *in pari delicto* defense, that defense is not the linchpin of the Court's analysis. It is somewhat problematic freely to apply common-law defenses to implied private causes of action under federal laws expressing policies of public protection. *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) ("We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes"); *Kuehnert,* 412 F.2d at 705 (Godbold, J., dissenting). The Fifth Circuit apparently recognized and approved the *in pari delicto* defense, however, in both *Kuehnert* and *Gordon.* Since both of those cases involved assertions of private claims under NYSE rules (albeit not Rule 405), they are sufficiently analogous to Wolfson's case for the Court to infer that *in pari delicto* exists as a defense to alleged violations of Rule 405. Accordingly, and for the same reasons expressed in the text of this opinion, the Court alternatively holds that the defendants have a meritorious *in pari delicto* defense to Wolfson's Rule 405 claim for the purposes of the instant summary judgment motion.

law, asserting a claim based upon the common-law tort of fraudulent misrepresentation.

Aside from the state law aspect of Count III, this count differs from its predecessors in that Wolfson alleges that the defendants fraudulently induced him to sell not only his Continental stock, but also shares in three other corporations: Universal Marion Corporation, Merritt-Chapman Scott Corporation, and American Motors Corporation. Since the Court has already determined that Wolfson has no federal claim in connection with his Continental sales, it is only the sales of stock in the other three corporations which might give rise to a federal cause of action in Count III.

These allegations are somewhat troublesome insofar as they alleged injury based on sales of stock in corporations other than Continental. As to plaintiff's injuries resulting from the criminal conviction, of course, only the sales of Continental stock are involved, since only those sales were alleged in the indictment upon which Wolfson was eventually tried and convicted. The only other claim for damages in Count III arises out of Wolfson's defense to "four civil proceedings brought in the states of New York and Kentucky in 1966." Plaintiff's Third Amended Complaint, Count III, ¶¶ 10, 11(d). Upon examination, the complaint itself discloses that these civil actions, too, involve only Wolfson's Continental sales, since Paragraph Ten alleges that the civil actions were instituted by stockholders of Continental. The Court concludes, therefore, that Count III of the Third Amended Complaint contains no allegation of injury directly relating to the sales of stock in any corporation other than Continental.

In the Court's view, this fact is fatal to Wolfson's cause of action under Count III. Wolfson's complaint embodied in Count III—both as to the federal and state causes of action—essentially sounds in tort. Applying common law tort principles to Wolfson's federal claim, the Court believes that actual injury is a necessary element to private causes of action based on alleged violations of stock exchange rules. Cf. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Wolfson has alleged no actual injuries proximately resulting from his sale of stock in any corporation other than Continental; therefore, it is the opinion of this Court that insofar as Count III alleges a private, federal cause of action for damages in connection with Wolfson's sale of stock in Universal Marion, Merritt-Chapman Scott, and American Motors, that count fails to state a claim upon which relief can be granted. As to the portion of Count III which seeks to recover under federal law, then, the defendants' motion to dismiss must be granted.

That portion of Count III which seeks to recover upon state law by invoking this Court's pendent jurisdiction must fail for similar reasons. Count III clearly relies on state common-law principles of tort law, specifically upon the tort of fraudulent misrepresentation. As far as Wolfson's transactions in the stock of Universal-Marion, Merritt-Chapman Scott, and American Motors are concerned, once again the failure to allege any damages proximately resulting therefrom precludes Wolfson's recovery under Florida law,[18] since actual injury is a necessary element of that tort. See *Casey*

---

**18.** In connection with the allegations of Wolfson's complaint which seek to recover solely under state law, Wolfson claims a cause of action "under the laws of the State of New York and of Florida." It is now well settled, of course, that as to state law matters a federal district court applies the choice of law rules which govern actions brought in the state courts of the forum state. *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort actions, the Florida courts still apply the traditional choice of law

rule *lex loci delicti,* determining the substantive issues in a case by looking to the law of the state where the tort occurred. *Astor Electric Service, Inc. v. Cabrera,* 62 So.2d 759 (Fla. 1952); *Ganem v. Ganem de Issa,* 269 So.2d 740 (Fla.3d Dist.Ct.App.1972), *cert. denied,* 414 U.S. 1113, 94 S.Ct. 844, 38 L.Ed.2d 740 (1973). Since Wolfson's complaint discloses that the fraudulent misrepresentations of the defendants, if any, occurred in Florida, the Court has chosen to apply Florida law in addressing Wolfson's substantive claims under state law.

*v. Welch,* 50 So.2d 124 (Fla.1951); *Cape Cod Trust Co. v. Wixon,* 143 So.2d 339 (Fla.2d Dist.Ct.App.1962).

■■■■■ As additional grounds for dismissing that part of Count III which purports to rely upon state law, the Court would note that since it has already been determined that Wolfson cannot prevail in this case under federal law, the Court may dismiss the pendent state claims in the exercise of its discretion.[19] In this case, the Court feels that to the extent that Count III alleges a claim under state law, a dismissal is in order. Despite the length of time since Wolfson first filed a complaint in this cause, this litigation is still in its early stages. By previous order, discovery has been strictly limited to items of threshold importance; thus, the parties have to date incurred only a fraction of what the eventual costs of this litigation would amount to. Were the Court to retain jurisdiction over Wolfson's state claims, the Court would be in effect placed in the position of trying a state case of somewhat dubious merit where diversity of citizenship does not even arguably exist. Especially in light of the crowded conditions of this Court's civil docket, that course of action seems clearly ill-advised. For these reasons, the defendants' motion to dismiss will be granted as to that portion of Count III which seeks to recover under state law.

Count IV of Wolfson's complaint relies wholly on pendent jurisdiction and seeks to recover punitive damages under state law for the intentional torts recounted in the previous portions of his complaint. For the reasons outlined in the preceding paragraph, the defendants' motion to dismiss Count IV will be granted.

For the foregoing reasons, the Court will direct the Clerk to enter final judgment for the defendants as to each count of Wolfson's third amended complaint with prejudice, costs to be taxed to the plaintiff.

---

19. The seminal case articulating modern concepts of pendent jurisdiction, *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), contains the bald statement that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139.

Subsequent developments suggest, however, that the dismissal of the pendent state claims is discretionary rather than mandatory. *See, e. g., Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *O'Connell v. Economic Research Analysts, Inc.,* 499 F.2d 994, 996 (5th Cir. 1974); *Brunswick v. Regent,* 463 F.2d 1205 (5th Cir. 1972).