HERSEY, Chief Judge.
Joseph Ward brought an action for legal malpractice against Howard M. Zeidwig and his professional association. The trial court granted summary final judgment for attorney Zeidwig holding that plaintiff Ward was collaterally estopped from proving his case, relying on Freeman v. Rubin, 318 So.2d 540 (Fla. 3d DCA 1975). Ward appeals.
Zeidwig represented Ward in federal court in a case in which Ward was charged with and convicted of conspiracy to import and distribute marijuana. Ward’s first conviction was reversed but, after retrial, his second conviction was affirmed on appeal. United States v. Hayes, 676 F.2d 1359 (11th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982).
A summary of the facts in the criminal case are set out in the report of the first appeal, United States v. Meacham, 626 F.2d 503, 506 (5th Cir.1980) (footnote omitted):
The evidence establishes that the appellants [including Ward] conspired to import marijuana from Colombia into the United States. They arranged to have a pilot named Travis Paul and a copilot Paul had selected fly from Ocean Springs, Mississippi, to Colombia to get a load of marijuana. The two pilots were to have flown the marijuana from Colombia to a small airstrip in Newborn, Georgia. Much to the appellants’ distress, Paul turned out to be a Drug Enforcement Administration (DEA) informant, and the copilot turned out to be an undercover agent. On October 8, 1978, at the direction of the appellants, Paul and the copilot began their flight in a plane owned by Metsger. Just before reaching the Colombian coast, the plane developed fuel problems and crash-landed in the sea. The crew of a passing ship rescued Paul and the copilot.
On the night of October 10, DEA Special Agent Jack Taylor, who was in charge of the investigation, staged the return of Paul and the copilot to Newborn. Two of the defendants were apprehended at the Newborn airstrip that night. The others were arrested during the following weeks.
At his criminal trial, appellant, a Fort Lauderdale policeman during the time of the conspiracy, contended that he had been working undercover, albeit without approval of his department, against the other defendants and that therefore he did not have the criminal intent required for conviction of the crime. He testified that he had been in contact during the conspiracy with a DEA agent in Connecticut named Hoyt, and had kept Hoyt advised of the activities of the other four defendants. Hoyt, however, testified that although he had spoken on the telephone with appellant in September and October, appellant had reported nothing of value with respect to the case. 626 F.2d at 510. The factual issue, therefore, was whether appellant had in reality been working undercover or had simply “pretended” to be working undercover so as to provide a bogus defense in the event of prosecution. The jury resolved this question against appellant in both trials.
After appellant’s second conviction was affirmed on appeal, he filed a motion to vacate, modify or set aside his sentence pursuant to 28 U.S.C. § 2255, on the grounds of ineffective assistance of counsel.
At the hearing on this motion appellant testified that he had taped several telephone conversations with Hoyt, including a conversation on September 21,1978, during which appellant told Hoyt some of the details of the drug operation, including the names of several of the participants, where the plane was to land upon its return, and the airplane’s “N” number. Two former fellow Fort Lauderdale police officers testified that they had listened to the tape of the September 21 conversation near the *217 end of September, and corroborated appellant’s version of what the tape revealed. An affidavit of a third police officer stated that he had been with appellant on September 21, 1978, and had overheard appellant’s side of the conversation with Hoyt, and that he also had listened to the tape.
Appellant further testified at the hearing on the motion that he had told Zeidwig that he had a tape of the September 21 conversation with Hoyt, but that Zeidwig had refused to listen to the tape, had told appellant that the tape was illegal and inadmissible, and that appellant should destroy the tape. Before his second trial appellant again mentioned the tape to Zeidwig but Zeidwig became very upset, according to appellant, because appellant had not destroyed the tape, and again told appellant that the tape was illegal and inadmissible. Thereafter, appellant did destroy the tape.
Testifying by deposition, Zeidwig explained that he knew about the tape but he felt it unnecessary to listen to it because appellant had explained to him what was on the tape, and that he (Zeidwig) had decided not to attempt to introduce the tape into evidence because he thought it would hurt his client’s case.
After the hearing the court denied appellant’s motion to vacate, making the following detailed findings of fact and law:
1. The Court, having observed the witnesses testify at trial, credits the testimony of agent Hoyt and discredits the testimony of Ward in respect to what Ward told Hoyt on September 21, 1978. The Court finds that Ward called Hoyt on September 21, but that he did not inform Hoyt of the details of the Alabama smuggling operation;
2. Any tape recording of the September 21, 1978 conversation would have substantiated finding number 1;
3. Any tape recording wherein Ward advised Hoyt of any details of the smuggling operation would have taken place after September 21, 1978;
4. Hoyt called Ward on September 22, 1978 and was informed by Ward that he was going to assist a friend in purchasing a DC-3 in Texas which would be used to haul freight for Litton Industries and for carrying skydivers;
5. Jerry Pickett could not testify at Ward’s second trial whether he was in fact at Ward’s house on September 21, 1978 or whether it was in October of 1978. The Court finds that he was not present at Ward’s house on September 21, 1978;
6. Gene Dodge had no personal knowledge (except what he was told by Ward) as to the specific date Ward called agent Hoyt with information;
7. Donald Schultz had no personal knowledge (except what he was told by Ward) as to the specific date Ward called agent Hoyt with information;
8. Any taped conversation which Pickett, Dodge, or Schultz heard wherein Ward advised of the marijuana smuggling details would have occurred after September 21, 1978;
9. From August 1978 through October 10, 1978, Ward was not acting under the authority of the Fort Lauderdale Police Department or any agency of the DEA;
10. Ward initiated no contact with any law enforcement agency or agent Hoyt after September 21, 1978 until he called Hoyt on October 10, 1978 and informed Hoyt that he had some names of some people he expected to be involved in marijuana smuggling;
1L Zeidwig did not listen to Ward’s September 21, 1978 tape;
12. The United States had no knowledge that Ward had taped any conversations relative to this case;
13. Zeidwig did advise Ward that he may have violated Florida Statute § 934 [ch. 934] and that in his opinion, he was not within the law enforcement exception;
14. Zeidwig did walk out of his office when Ward attempted to play a tape to him in the presence of Pickett and Dodge because Zeidwig did not want to risk affecting his confidential attorney/client relationship with Ward and because the *218 tapes may have been obtained in violation of Florida Statute § 934 [ch. 934];
15. Zeidwig never advised Ward that the September 21, 1978 tape was inadmissible in Court;
16. Zeidwig never advised Ward that it was a crime to play the tape;
17. Zeidwig never advised Ward to destroy the tape;
18. If in fact Ward did destroy the tape, he did it on his own initiative and not on the advice of Zeidwig.
19. Ward sought to use the September 21, 1978 tape recording during the course of his second trial but Zeidwig made the decision not to use and/or attempt to admit the tape into evidence at trial.
Below, appellees contended that the order rendered by the federal court on appellant’s motion to vacate should estop appellant from maintaining the malpractice action. The lower court agreed.
Appellant contends that collateral estop-pel cannot be asserted because that doctrine requires an identity of parties in both lawsuits, Mobil Oil Corporation v. Shevin, 354 So.2d 372 (Fla.1977), and the parties before the court on the motion to vacate were appellant and the United States, whereas the parties in the malpractice case are appellant and Zeidwig.
Appellees respond that the requirement for identity of parties, also known as the mutuality doctrine, is no longer viable in a case such as this, where the plaintiff has previously litigated the same issues in an earlier proceeding and lost.
Appellees rely on McCord v. Bailey, 636 F.2d 606 (D.C.Cir.1980), cert. denied, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981). In McCord, a convicted Watergate burglar brought a malpractice suit against his attorney who had represented him in-the criminal proceeding, and the court held, inter alia, that collateral estoppel barred the malpractice claim where allegations of ineffective assistance of counsel had been rejected on the defendant’s coram nobis petition. This was so even though the requirements of the doctrine of “mutuality of parties” was not met.
McCord relied in part on Parklane Hosiery Company v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), and Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).
In Blonder-Tongue, the court held that in a patent infringement suit, the patentee is estopped to assert the validity of a patent that has been declared invalid in a prior suit in federal court against a different defendant. The court noted that the mutuality requirement had “been under fire,” and that, as a result, the rule had been changed so that only the party against whom a plea of estoppel was asserted had to have been a party in the prior action. 91 S.Ct. at 1439.
In Parklane, the court stated that the “mutuality” requirement had been abandoned at least in some cases, and discussed the development of both “defensive” collateral estoppel, where a plaintiff is estopped from asserting a claim that hé has previously litigated and lost against another defendant, and “offensive” collateral estop-pel, where a plaintiff seeks to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff. 99 S.Ct. at 650. The Parklane court went on to hold that, in the federal courts, trial courts would be given broad discretion to determine when “offensive” collateral estoppel should be applied. Id. at 651. See also Wolfson v. Baker, 444 F.Supp. 1124 (M.D.Fla.1978), aff'd, 623 F.2d 1074 (5th Cir.1980), cert. denied, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981) (in applying collateral estoppel, mere technical aspects of mutuality and privity have been relaxed, so that collateral estoppel may be invoked where it appears that the party against whom it is asserted had a full and fair opportunity to litigate the issue in a prior proceeding).
Appellant argues that because the burden of proof, presumptions and legal standards are or may be different he should not be estopped from litigating for the fourth time his innocence of the crime charged.
*219 If this were a case of first impression we would adopt and echo the criticism expressed by Justice Traynor in the following excerpt from his opinion for a unanimous California Supreme Court in Bernhard v. Bank of American National Trust and Savings Association, 19 Cal.2d 807, 812, 122 P.2d 892, 895 (1942): “No satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as res judicata against a party who was bound by it is difficult to comprehend.”
While it may be logically and legally acceptable to plead alternative causes of action we are not aware of any provision for pleading or proving alternative factual settings. It should not matter that in one case the government is the adversary and in this case Zeidwig is the adversary when the question is: what are the underlying facts? And collateral estoppel relates to factual issues only — res judicata, a broader estoppel concept, takes over where collateral estoppel leaves off — to include legal issues.
As appellant points out, however, Florida has not followed the federal lead in abandoning the doctrine of mutuality. In Trucking Employees of North Jersey Welfare Fund, Inc. v. Romano, 450 So.2d 843, 845 (Fla.1984), our supreme court stated:
We recognize that the federal courts have abandoned the requirement of mutuality of parties as a prerequisite to asserting the doctrine of collateral estop-pel. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). We are also aware that other jurisdictions have also receded from the mutuality requirement. See, e.g., Bernhard v. Bank of America National Trust & Savings Association, 19 Cal.2d 807, 122 P.2d 892 (1942). However, the well established rule in Florida has been and continues to be that collateral estoppel may be asserted only when the identical issue has been litigated between the same parties or their privies. Mobil Oil Corp. v. Shevin, 354 So.2d 372 (Fla.1977); Universal Construction Co. v. City of Fort Lauderdale, 68 So.2d 366 (Fla.1953). [Emphasis added.]
Appellees argue that Romano is distinguishable, because in that case “offensive” rather than “defensive” collateral estoppel was urged, as the plaintiffs in a civil proceeding attempted to use the defendants’ prior criminal conviction to prevent the defendants from relitigating issues resolved in the earlier criminal proceeding.
Although Romano did involve “offensive” rather than “defensive” collateral estoppel, the Romano court cited both Parklane and Blonder-Tongue, so the court was clearly aware of the reasoning in those cases, one of which involved “offensive” and the other “defensive” collateral estoppel. Accordingly, we conclude that this court is bound by the supreme court’s statement that mutuality of parties remains a prerequisite to application of. the doctrine of collateral estoppel.
Accordingly, we are compelled to reverse to permit appellant for the fourth time to attempt to prove that he was but an innocent pawn or actually allied with law enforcement in a drug transaction and that, but for the ineffective assistance of his counsel, he would have been exonerated in the first instance.
Having made no pretense concerning our preferences in the matter we certify to the Supreme Court of Florida, as a question of great public interest, the following:
Whether identity of parties or their privies continues to be a prerequisite in Florida to application of the doctrine of collateral estoppel?
REVERSED AND REMANDED.
DOWNEY, J., and OWEN, WILLIAM C., Jr., (Retired), Associate Judge, concur.